In re Frederik A. FIGGE and Kirsten A. Figge, Debtors.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Indian Springs State Bank, Plaintiff,

v.

Frederik A. FIGGE and Kirsten A. Figge, Defendants.

Bankruptcy No. LA 85–07193–LF.
Adv. No. 85–2416–LF.

United States Bankruptcy Court,
C.D. California.

Oct. 31, 1988.

Kathleen L. Wood, Newport Beach, Cal., Michael C. Manning, Morrison, Hecker, Curtis, Kuder & Parrish, Washington, D.C., Michael A. Rump, Morrison, Hecker, Curtis Kuder & Parrish, Overland Park, Kan., for plaintiff.

Steven M. Dickson, Dickson & Pope, P.A., Kansas City, Mo.

Craig Lytle, Hermosa Beach, Cal., Steven M. Dickson, Dickson & Pope, Kansas City, Mo., for debtors.

## MEMORANDUM OF DECISION

LISA HILL FENNING, Bankruptcy Judge.

### Introduction

Frederik and Kirsten Figge, the debtors in this chapter 7 case, owe Indian Springs State Bank ("ISSB") $200,000.00 plus interest on account of two personal loans made to them by ISSB in 1982. The Federal Deposit Insurance Corporation ("FDIC") is now the receiver for ISSB, which was declared insolvent in 1984. The FDIC filed a timely complaint to determine that the Figges' debt to ISSB is nondischargeable.

The FDIC alleges that the Figges intentionally deceived ISSB into making loans in three ways: (1) the financial statements submitted by them to obtain the loans were materially false, under the standard of 11 U.S.C. § 523(a)(2)(B); (2) at the time they executed the notes, the Figges did not intend personally to repay them, causing the debt to be nondischargeable under 11 U.S.C. § 523(a)(2)(A); and (3) the loans were part of a massive scheme to defraud the bank and the banking regulators, resulting in willful and intentional infliction of injury within the meaning of 11 U.S.C. § 523(a)(6).

The Figges insist that their financial statement was accurate and that no misrepresentations were made. Their principal defense, however, is that the president of ISSB was personally aware of all of the true circumstances of the loans, and indeed had an ulterior business motive for approving the loans. The Figges contend that the characterization of the loans as "personal notes" and the perfunctory documentation of the loans were solely for the purpose of meeting ISSB's regulatory obligations. In fact, the loans were part of a $3 million financing package for three real estate limited partnerships, Haiku Holdings, Haiku Partners, and First United Partners IV, which were supposed to pay the loans. To evade regulatory constraints, ISSB agreed to make the loans to individual limited and general partners, instead of the partnerships directly. The Figges claim that ISSB did not rely on their personal financial statement or their personal promise to repay, so that even if those were false, it did not matter.

This Court finds that the loans were obtained under false pretenses and by use of materially false and misleading financial statements. ISSB did rely on the financial statement: it conducted its customary credit check on the Figges, and turned down several other applicants in this scheme, which demonstrates that loan approval was not automatic. Moreover, Figge was one of the three instigators of this scheme to deceive the regulators. Predictably resulting in huge losses to ISSB—indeed, substantially contributing to its insolvency—the scheme also satisfies the criteria for willful and intentional injury under 11 U.S.C. § 523(a)(6). This Court concludes that the Figges' "unclean hands" defenses are insufficient as a matter of law, and holds that the debt is nondischargeable.

## I. STIPULATED FACTS

1. The FDIC is a corporation organized and existing under the laws of the United States of America and is appearing in its capacity as receiver for ISSB.

2. ISSB was a banking institution organized and existing under the laws of the State of Kansas prior to January 27, 1984.

3. On January 27, 1984, the Kansas State Bank Commissioner determined that ISSB was insolvent and tendered the receivership of ISSB to FDIC.

4. FDIC accepted its appointment as receiver of ISSB on January 27, 1984, and pursuant to Chapter 9, Article 19 of the Kansas Statutes Annotated, FDIC is the owner and holder of all ISSB's assets, claims, and causes of action.

5. At all times relevant to the present action, defendants Frederik A. Figge and Kirsten A. Figge were married.

6. Debtors applied for loans from ISSB to finance their purchase of Class A and B limited partnership interests in Haiku Partners and Haiku Holdings, as well as a limited partnership interest in First United Partners IV. All three were Hawaiian limited partnerships.

7. Frederik A. Figge was also one of three general partners in Haiku Holdings. He was supposed to be one of the general partners of First United Partners IV when it was formed.

8. In connection with their application for loans from ISSB, debtors submitted or caused to be submitted on their behalf a financial statement to ISSB. Debtors represented that the financial statement was a true and accurate description of their financial condition.

9. The financial statement submitted by debtors to ISSB in connection with their application for loans from ISSB was executed by Frederik A. Figge and dated June 23, 1982.

10. In June 1982, Frederik A. Figge was a general partner in 16 real estate limited partnerships.

11. On or about July 27, 1982, Frederik A. Figge and Kirsten A. Figge executed a promissory note payable to ISSB (the "July Note"). This loan was funded by ISSB on August 5, 1982.

12. On or about November 1, 1982, debtor Frederik Figge duly executed and delivered to ISSB, for value received, a negotiable promissory note (the "November Note") whereby he promised to pay to ISSB or order the sum of $100,000.00 plus semi-annual interest payments at the rate of 15% per annum from November 1, 1982, until paid in full.

13. As a part of the same transaction and in order to secure payment of the November Note, Figge executed and delivered to ISSB a security agreement dated November 1, 1982 (the "November Security Agreement"), granting to ISSB a purchase money security interest in Figge's entire right, title, and interest in and to Haiku Holdings and Haiku Partners.

14. On or about December 29, 1982, debtors duly executed and delivered to ISSB a negotiable promissory note dated December 22, 1982 (the "December Note"), whereby they promised to pay to ISSB or order the sum of $100,000.00, plus interest at the rate of 14% per annum from December 22, 1982, until paid in full.

15. As a part of the same transaction and in order to secure the payment of the December Note, debtors executed and delivered to ISSB a security agreement dated December 22, 1982 (the "December Security Agreement"), granting to ISSB a purchase money security interest in the debtors' entire right, title, and interest in and to First United Partners IV.

16. The July note has been paid. The November and December notes have not been repaid, despite proper demand by ISSB.

17. The amount of unpaid principal on the November Note is $100,000.00 with unpaid interest thereon at 15% per annum from and after November 3, 1982, to May 8, 1987, in the amount of $66,445.20 and after May 8, 1987, at $41.10 per diem.

18. The amount of unpaid principal on the December Note is $100,000.00 with unpaid interest at 14% per annum from and after January 14, 1983, to May 8, 1987, in the amount of $60,410.96 and after May 8, 1987, at $38.36 per diem.

II. ADDITIONAL FINDINGS OF FACT

A. Debtors' Real Estate Experience

Debtor Frederik A. Figge, an engineer with Northrop Corporation, became enthralled with the concept of investing in real estate for tax shelter purposes during the 1970's. After buying a few desert properties around 1970, he started investing in Hawaiian real estate in 1976. With

the exception of two early properties, all of his Hawaiian real estate interests were acquired through limited partnerships and syndications. He frequently solicited his Northrup colleagues to join as limited partners in his ventures. He had a pool of 30–35 regular investors in his various projects.

By 1982, Figge qualified as a relatively sophisticated real estate syndicator, quite familiar with the business of property acquisition and management, the disclosure requirements governing private placement memoranda for syndications, and the rights and responsibilities of general partners in real estate limited partnerships. He served as general partner for 10 to 15 limited partnerships. Many of these involved properties that he acquired through Sam Daily, a Hawaiian real estate broker with whom Figge worked closely from about 1978. In some transactions, Daily served only as a broker; in others, as partner; in some as both.

Figge's wife Kirsten was not actively involved in any of his real estate ventures, although she was the co-owner and signatory on many loans and transactions, including the ones at issue here. She did, however, participate in some of the meetings at which investors were recruited, and of course, personally benefitted from the tax and other advantages of the transactions.

After 1980, however, Figge's luck turned. The land speculation fever that had been building in Hawaii finally broke. As Figge acknowledged in his testimony, property values declined sharply in the face of soaring interest rates and negative property cash flows. Daily put it even more strongly: the real estate business was in "dire shape." Figge faced losing many of his properties. By early 1982, he felt he "was going under and was taking friends under" with him. Many of his partnership properties fell into arrears on mortgage payments during the first half of 1982.

To stave off foreclosure, Figge resorted to what he called "artificial sales," namely, paper sales generating paper profits only, in which no cash changed hands (except sometimes in the form of real estate bro-kers commissions). Because properties bought after 1981 were subject to "due on sale" clauses in their mortgages, these paper sales were by "agreement of sale" rather than grant deed, and left the seller liable on the underlying obligation. To avoid triggering the "due on sale" clauses, these transfers were not recorded.

Moreover, in Hawaii, mortgage obligations are full recourse as to the original obligor. Figge acknowledged that he knew he was personally liable on the mortgages for properties sold by "agreement of sale."

B. The Haiku Holdings/Haiku Partners Scheme

By mid–1982, it became apparent that piecemeal salvage efforts were not going to be enough. In June 1982, Sam Daily, Franklin Winkler, who was another real estate investor colleague of Daily's, and Frederik Figge developed an ambitious plan to sell their negative cash flow partnership properties to a new entity to be called Haiku Holdings. Each of the three held an interest in approximately $2 million worth of such properties. The $3 million necessary to cure arrearages and reinstate mortgages in default for these properties was to be raised in part by soliciting new "limited partners."

Later, another element was added to this plan: the negative cash flow properties were then transferred to "mortgage pullers" to be used by them as downpayment on the acquisition of the Kanone Kai development, a 23–unit condominium building belonging to another real estate speculator, Ralph Barouche. Figge personally obtained three "mortgage pullers" himself, paying them off personally. Daily obtained and paid the others. As Figge defined the term, a "mortgage puller" was a person who acquires a mortgage from a lender, secretly on behalf of someone else but based on his or her own financial statement, when the real parties in interest could not themselves qualify for such a loan. Figge characterized it as in effect "renting" a financial statement. The "mortgage pullers" did not intend to repay such loans themselves.

Figge, Winkler and Daily worked together to develop a Private Placement Memorandum ("PPM") to raise the first $1.3 million of the $3 million they needed. The plan was to sell limited partnership interests in two new partnerships created to hold the properties transferred by the general partners. These new partnerships were called Haiku Holdings and Haiku Partners. Figge became general partner and also held a limited partner interest in Haiku Holdings; he was a limited partner in Haiku Partners.

A series of meetings was set up by Figge to recruit investors under the PPM. The first was held in June 1982, followed by meetings in July and November 1982. Figge ran a tape recorder for all three: transcripts and tapes were introduced in evidence. Daily was the principal salesman at these meetings. The pitch: investors would split $600,000.00 in tax benefits, due to depreciation of $400,000.00 and negative cash flow of $200,000.00 per year. Daily acknowledged that this was not a profit-making effort, but rather a tax shelter plan.

The most extraordinary feature of this "investment" was that none of the limited partners invested a dime of his or her own money; all of it was to be borrowed from ISSB. As Daily explained, the limited partner format was necessary because ISSB could not simply loan the partnership the $1.3 million; ISSB was subject to regulations limiting loans for an individual or out-of-state entity to $100,000.00 each. In effect, the Haiku Holdings partnership was going to use the investors' personal financial statements to obtain a disguised $1.3 million loan for the partnership. Ultimately, about $3 million in losses were obtained in the same manner for Haiku Holdings, Haiku Partners and First United Partners IV. The loan proceeds were directly deposited into the Haiku Holdings and other partnership accounts by ISSB; the borrowers never saw the money. In exchange for that deposit, they received a limited partnership interest in Haiku Holdings, Haiku Partners or First United Partners IV. Those partnership interests were pledged to the bank as security for the loans. In effect, the plan constituted "mortgage pulling" on a grand scale.

The reason that ISSB was so ready and willing to advance these loans, according to Daily, was the arrangement that he and Winkler had worked out that called for a "guy in New York," later identified as Mario Renda, to deposit funds in ISSB that could be used by the bank to fund the loans. Daily bragged that if ISSB did not fund the loans, Winkler would cause Renda to pull his deposits out of the bank.

The PPM correctly describes the notes as personal obligations with recourse against the individuals. During the investor meetings, however, Daily assured the would-be investors that, although technically recourse notes, the risk was essentially "nil" that the investors would have to repay them. In the first instance, the partnerships were supposed to pay the notes. The second line of defense was the intended construction loan that would take out the ISSB loans. The third line of defense was the guarantee of a portion of the notes by Daily and Winkler. Supposedly, only if payment was not made from those sources would the individuals be at risk. Daily admitted to the investors that he might have to "lie a little bit" to any prospective construction lender to obtain funds to repay ISSB.

The PPM also correctly describes the notes as 12-month notes, with a roll-over option. Again, however, Daily described a secret side deal with ISSB: the notes would be *automatically* rolled over for a total of three years. Again the explanation came that the bank was not permitted to make loans for longer than one year unless it had sufficient long-term money to fund them.

## C. Figge's Role in the Haiku Holdings Scheme

Daily did most of the talking at the investor meetings. But Figge was much more than just one of the passive investors caught up in this scheme. He was one of the three general partners who organized and ran the operation. Figge's attempts to

minimize his role were totally unpersuasive.

It is true that the evidence showed that the Haiku Holdings plan was the brainchild of Daily and Winkler, who originally were to be the only general partners. They were also the ones who dealt with the bank, lined up the New York money, and put up the personal guarantees. In early June, however, Figge became deeply involved. He was going to contribute one-third of the properties; Winkler and Daily were counting on him to recruit most of the investors. The evidence overwhelmingly shows that the scheme became a joint venture with a common plan from that date, even though the details of its structure had not yet assumed their final form. In the fall of 1982, Figge formally became a general partner retroactively to June 1982.

Moreover, Figge knew about and actively advocated deceitful conduct in connection with this scheme. For example, he personally suggested that the investors omit any reference to their ISSB loans on any future financial statement. Figge fully endorsed all elements of the scheme and personally made the Daily pitch to specific investors, like his own doctor.

Figge also knew, for example, that transfer of the $6 million of property to Haiku Holdings was specifically never recorded "to avoid disturbing existing financing," for it was his responsibility to arrange the transfers. The escrow companies handling the transfers were instructed not to reveal the transfers to the lenders whose "due on sale" clauses would otherwise have been triggered, as shown by an internal Haiku Holding memorandum addressed to Figge.

In other words, Figge knowingly participated in this scheme as one of the organizers, not one of the followers. He was fully cognizant of the multitude of deceptions involved.

### D. Debtors' Financial Statement and Loan Application to ISSB

Figge was also one of the individuals who submitted a personal financial statement to ISSB to obtain a $100,000.00 loan in July 1982. The loan was secured only by Figge's interest in the limited partnership. Ultimately, a total of three $100,000.00 loans were advanced to Figge. The third loan, approved in December 1982, was used to repay the July loan. Exactly how the regulatory limits were circumvented to make the additional loans to Figge was not clear from the evidence.

Frederik Figge prepared the June 1982 financial statement submitted to ISSB. He used a GECC (General Electric Credit Corp.) form that just happened to be handy. It is undisputed that he intended to submit it to obtain a Haiku loan. Kirsten Figge later ratified it by letter. The financial statement was transmitted to ISSB through Sam Daily, who acted as the Figges' agent for purposes of procuring these loans. The Figges did not at any time before the funding of their loans personally discuss their application or their loans directly with any representative of ISSB. Daily communicated the bank's requests to the Figges and transmitted the documents from them to the bank. The Figges expressly authorized him to do so.

As required by ISSB, in July, 1982, both Frederik and Kirsten Figge executed a form letter confirming their application for the first $100,000.00 loan and the accuracy of the June financial statement that had been submitted in support of the application. On the same date, they also executed an ISSB form transmittal letter to William Lemaster, president of ISSB, enclosing the "Twelve months' promissory note," security agreement, and related documents.

By letter dated October 31, 1982, the Figges confirmed and updated the information contained in the financial statement. Upon the updating of the financial statement, ISSB advanced the November, and later the December loans.

### 1. *Misrepresentations About Assets and Liabilities*

Testimony about the significance of the financial statement consumed days of trial, because it required detailed analysis of virtually the whole history of the Figges' Hawaiian real estate deals. On the asset side, the financial statement listed Figge's house

and cars, which were correctly identified as "subject to debt." It also listed cash and personal property, which were not "subject to debt." "Other" assets were described as: "Various Partnerships" valued at $750,000.00, and "Trust Deeds" which Figge conceded were overvalued at $11,000.00 when they should have been listed as worth $9,100.00.

On the liability side, Figge listed his home mortgage and several personal loans, although he testified that the amount of the credit union loans was understated by almost $4,000.00 and the monthly payment understated by $300.00. Both the partnership and trust deed assets were described as "not subject to debt," which Figge had to admit was false. He did not list *any* debt in connection with the partnership interests. Even more significant was his "no" answer to the question, "Are you a co-maker, endorser or guarantor on any loan or contract?" Figge, of course, was a co-maker or guarantor on many partnership obligations for his Hawaiian properties.

The total net worth reflected on the financial statement was $867,380.00 of which $750,000.00 was the partnership interests. The financial statement supposedly netted out the equity and debt on Figge's partnership interests in arriving at the $750,000.00 value. Analysis of the true status of the various properties comprising the total establishes that Figge grossly overstated their value by failing to take account of all the outstanding defaults and liabilities. Moreover, almost one-third of the "equity" was derived from sham sales of the properties to Sam Daily and others, as described below. For purposes of this analysis, the "fair market values" estimated by Figge are assumed to be reasonable approximations.

a. FAF Canterbury Place, Ltd.

This partnership sold its property to Sam Daily by agreement of sale before June 1982. The "net equity" figure includes $63,000.00 as Figge's share. In fact, however, the sale was not "definite" as of the date of the financial statement to ISSB. Nor was Daily making payments on the

note. In addition, even though Figge treated the note as free and clear, and not subject to debt, he knew he remained personally liable for the underlying mortgage.

b. FAF Mokuleia Associates

The "net equity" figure also included $65,000.00 as Figge's share of the profits from the sale of this property to Sam Daily to avoid foreclosure. Figge knew that it was unlikely that Daily would make the contemplated payments—indeed, the most reasonable inference from this record was that Daily and Figge never intended that Daily make any payments. Foreclosure was a distinct possibility, which would result in a deficiency judgment against Figge. Yet he did not mention the possible liability. This property was in fact lost to foreclosure in 1984.

c. Figge & Murane Associates

This property was "sold" to Sam Daily in 1980. Daily in turn sold it, also by agreement of sale, to a third party who defaulted on the mortgage in 1982. In May 1982, the mortgage holder made demand upon Figge and his partners. They simply forwarded the warning notice to the third party, who apparently ignored it. Figge included about $10,000.00 as his equity under the agreement of sale in his ISSB financial statement without disclosing that the agreement and mortgage were both in default, and that he had contingent liability on the entire mortgage.

d. Figge & Hill Associates

This partnership held three condominium units, all in default as of June 1982. Sam Daily suggested that Figge exchange these properties for three held by Winkler. Daily pocketed a 6% commission on the exchange. It later turned out that one of the properties contributed by Winkler was worthless due to zoning problems. Moreover, Winkler was supposed to obtain a new mortgage as part of the deal, but could not—since the agreements of sale were not recorded, he was not title holder of record. Figge & Hill secured the $100,000.00 mortgage instead, on condition that Winkler was to make the payments. He did not. Figge and his partner each received $10,000.00 in cash from Winkler as

"boot" for their profit on the transaction. Winkler also furnished a note for $26,414.42, which was never collected. Figge included about $43,000.00 as his share of the "equity" in his ISSB financial statement without including any of the debt associated with these properties.

### e. FAF 2301–A Iolani, Ltd.

This partnership owned several properties, one of which was subject to an agreement of sale as of June 1982. The purchaser never made the payments, however, and the property was lost to foreclosure in 1985, resulting in a deficiency judgment of $10,000. The other major property, Village Mokuleia, was in arrears in the spring of 1982. That property was lost by deed in lieu of foreclosure after prolonged unsuccessful attempts to sell it.

### f. FAF Lilipuna II Associated

Sam Daily entered into an option agreement to acquire this property in 1979. As of June 1982, the option had expired by its terms two years earlier, but Figge asserted that both parties treated it as still valid. He admitted that the agreement was in default; Daily had made no payments. Nevertheless, Figge included $15,000 as his share of the equity under the option agreement. Like most, if not all, of the other transactions between Figge and Daily, this transfer was a sham.

### g. Figge & Moberly

One of the three properties held by this partnership had been sold by agreement of sale. During the spring of 1982, Figge had received foreclosure notices indicating that the purchaser had not been making the mortgage payments. He just sent the notices along to the purchaser, considering them to be the purchaser's responsibility. Again, he included his share of the sales price in his calculation of equity for his financial statement without any corresponding entry reflecting the default or contingent liability on the mortgage.

### h. FAF Wailehua, Ltd.

One of the three partnership properties was sold to Sam Daily. By the fall of 1982, this mortgage was also in default, but this change in status was not reflected in the October update of debtors' financial condition.

### i. FAF Lemon Road, Ltd.

The two condominium units held by this partnership were substantially in arrears as of June 1982. Figge included $47,000.00 as his share of the equity in his calculation of value on his financial statement—again, with no corresponding indication of the default or the outstanding debt.

### 2. *Analysis of the "Net Equity" Total*

Many of Figge's other partnership properties were on the market for years. No sales were successfully consummated. The partnerships either gave deeds in lieu of foreclosure or lost the properties to foreclosure.

Of the $750,000.00 in total assets listed on the debtors' financial statement as submitted to ISSB in July 1982, about $240,000.00 of the net equity set forth was based on the "paper transactions," and was not realizable. Failure to disclose the existence of the existing breaches of the "agreements of sale," the debt against these properties, its default status, and the possibility of massive contingent personal liability in the event of foreclosure constitutes a material misrepresentation of the debtors' financial condition at the time they applied for the ISSB loans.

That this overstatement of assets was intentional and not mere inadvertence is confirmed by two financial statements prepared by Figge within one and one-half months after the one for ISSB. In both of these statements, Figge valued his partnership holding at $529,000.00, approximately $220,000.00 less than represented to ISSB. When these two financial statements were prepared and submitted, Figge acknowledged that he owned the same properties and owed the same debt as in July 1982.

Significantly, the ISSB obligation was not reflected on any of Figge's later financial statements. Figge claims he just "netted" it out of his partnership net worth. This testimony is not credible in light of Figge's advice to other ISSB loan participants at the investor meetings, instructing them simply to omit any reference to their

ISSB loan from future financial statements because they were not really supposed to have to repay the loans.

### 3. *Misrepresentations About Income*

Debtors attempt to downplay the significance of these major omissions and misrepresentations about their assets and liabilities by arguing that ISSB was not particularly concerned about net worth. Instead, debtors contend that the most important criterion for the loan was cash flow. This argument, however, does not aid their cause, for the financial statement was also materially misleading as to the Figges' actual cash flow and expenses.

#### a. Partnership Income

First, the principal reason for all of the paper sales described above—and indeed for the Haiku scheme itself—was that the partnerships could not cover the negative cash flows on these properties. Most had long since exhausted the loan reserves set aside for that purpose; most of the limited partners refused to meet the capital calls. As Figge testified in his deposition, the partnerships simply could not keep up the high monthly negatives, which was why the exotic restructuring was proposed in the first place.

As of July 1982, Figge's partnerships were experiencing a total negative cash flow of approximately $18,000.00 per month, taking into account all of the mortgages that were supposed to be, but were not necessarily being paid at the time. The Figges' personal share of that negative was more than $3,000.00 per month. Debtors' attempt to portray their cash flow as marginally positive was not credible. Figge knew full well that the partnerships' monthly negative cash flow was at unsustainable levels.

#### b. Other Income Issues

The partnership's letter of agreement with ISSB required that individuals putting up their financial statements be in the 50% marginal tax bracket (at the time, $47,-000.00). The financial statement listed salary income from Figge's employment as $48,400.00 per year, and "Other Income" of $650.00/month from "interest and trust funds," and capital gains of $53,000.00 per

year for 1980 and 1981. Figge's salary was correctly stated. The $650.00 was not. It was supposed to reflect his income from his real estate partnerships collectively, and several trust deeds. As described above, however, those partnerships were collectively experiencing negative cash flow in 1982, and payments were not being made on the trust deeds from the "paper sales".

Furthermore, Figge acknowledged that the impressive capital gains described on the financial statement did not actually result in cash income, even though the financial statement listed it as such. These "paper gains" were based on the same "paper sales" described above. No cash was available from the source from which he could make payments on the loans he was seeking from ISSB. Compounding the misrepresentation, Figge answered, "No" to the question "Is any income listed in this section likely to be reduced before the credit requested is paid off," even though he did not anticipate even "paper" capital gains in 1982.

Thus, the financial statement made it appear that the Figges' monthly income was $9,065.00. In fact, the Figges' regular cash income each month as of June 1982 was approximately $4,000.00, once the phantom $4,415.00 per month in capital gains and the $650.00 in unrealized partnership income are backed out of the total. This overstatement of more than 100% was material.

Not only did the financial statement materially overstate debtors' income; it also understated their monthly expenses. The debtors owed monthly payments of $1,149.00 on their credit card and credit union loans, instead of only $874.00 as disclosed on the financial statement.

### E. The ISSB Credit Check

The partners' side agreement with the bank expressly required that all loan applicants individually meet ISSB's creditworthiness qualifications. ISSB's loan file for Figge bore notations in the handwriting of bank employees and officers, reflecting the

results of a satisfactory credit check on Figge that they ran through the Greater Kansas City Credit Bureau. The file also reflects that personal references were checked. According to J.W. Devine, a vice president and loan officer of ISSB at the time, this credit check was the standard procedure on personal loans.

After completion of this credit check, ISSB President William Lemaster approved the first Figge loan on or about July 27, 1982. There was no evidence that the loans were ever submitted for approval by the bank's board of directors or any loan committee. No direct evidence exists as to exactly what criteria were applied by Lemaster in this loan decision, for he was killed in a car accident in 1983, six months before the FDIC took over the bank.

The second and third loans were extended without any new loan application, just the update of the financial information by letter dated October 31, 1982. Again, Devine testified that the absence of any additional application was typical at ISSB.

ISSB did not require the Figges to submit verification forms for their employment or their bank accounts. Nor did ISSB require any title reports. Figge testified that this lack of documentation was unusual. He acknowledged, however, that banks differed substantially in their loan procedures. All of the evidence indicated that the procedures used for the Figge loan reflected ISSB's standard operating procedure. These types of weak loan documentation practices had been criticized by the FDIC in reports of its examination of the bank in February and August 1982, but apparently were common in smaller Midwestern banks.

### F. Debtors' Lack of Intent to Repay Loans

Figge admitted that he did intend that the bank be repaid, just *not* by him. Nor did he intend to take on any obligation to repay the notes himself.

Figge also admitted that he could not afford even the interest-only payments on the ISSB loans. Payable semi-annually, the interest on the loans accrued at the following monthly rates:

| | |
|---|---|
| Nov. 1982 loan | $1250.00 per month |
| Dec. 1982 loan | $1167.00 per month |
| Total | $2417.00 per month |

The monthly interest accrual of $2417.00 represented 60% of debtors' actual income.

Figge claimed that, due to his relatively modest income, the bank would never have been willing to loan hundreds of thousands of dollars to him, *but for* ISSB's "agreement" that the partnership and not Figge was supposed to repay the loan. As discussed below, the FDIC is not bound by the side agreement. But the facts are also against the Figges: the bank did not know that his income was only $4,000.00 per month. Figge led ISSB to believe it was $9,065.00 per month, a level that could support loan payments of $2,417.00 which would have only been 27% of income.

Nor did Figge expect to have the resources to pay the notes when they came due in 12 months, nor even if they were rolled over for two more years. But the debtors were not concerned about their inability to carry this new debt they were incurring: the evidence is overwhelming that the Figges never intended to repay the loans, even though they knew that the notes were personal obligations.

### III. DISCUSSION

#### A. Liability for Partner's Conduct

■ Figge failed in his attempt to disavow any misrepresentations or wrongful conduct by Sam Daily in connection with the loan application process or recruitment of the would-be investors. The evidence overwhelmingly established that Figge authorized Daily to act as his agent specifically for the purpose of obtaining the loans. Moreover, Figge was part of the joint venture from at least June 1982. The representations made by Daily, and the actions of Winkler and Daily in orchestrating the Haiku scheme were all in furtherance of the common business interests of Figge and the other partners, made in the ordinary course of business for the partnership. Figge was present when many of the

statements were made, and when the strategy was devised. He also knew of most of the conduct while the scheme was in progress. He was not an innocent pawn of his partners, but rather a guilty participant. Under *In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir.1986), Figge can properly be held accountable for the misrepresentations, fraud and deception by his partners, as well as his own.

### B. Nondischargeability Based on False Financial Statement

The FDIC contends that the Figges' debt to ISSB is nondischargeable under the standard of 11 U.S.C. § 523(a)(2)(B) because the Figges submitted a materially false financial statement in order to obtain the loan. To prevail, the FDIC must prove that:

(1) The debtor knowingly submitted a written financial statement that was materially false;

(2) The debtor did so for the purpose of inducing the lender to make the loan;

(3) The lender reasonably relied upon the financial statement in making the loan.

*See, e.g., In re Lansford,* 822 F.2d 902, 904 (9th Cir.1987).

Each element of alleged fraud must be proven by clear and convincing evidence. *In re Tilbury,* 74 B.R. 73, 77 (9th Cir.BAP 1987), *aff'd without opinion,* 851 F.2d. 361 (9th Cir.1988). Because of the importance of preserving a debtor's right to a discharge and a "fresh start," exceptions to discharge are narrowly construed. *See Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *In re Houtman,* 568 F.2d. 651 (9th Cir.1978).

■ In this case, the false statements were pervasive and intentional. Figge misrepresented the status of his properties, disguised "paper" sales, ignored defaults, pretended that cancelled sales had in fact been consummated—all of which resulted in a more than $240,000.00 overstatement of net equity. This 33% overstatement is material: this amount would have been more than sufficient to repay the loans in question. This overstatement was not a

mere "honest" mistake or difference of opinion as to the fair market value of the property. Indeed, the analysis set forth above assumes the reasonableness of fair market values used by Figge, because erroneous opinions of value do not, by themselves, satisfy the requirement of falsity. *See, e.g., In re Rosel,* 63 B.R. 603, 606 (Bankr.W.D.Ky.1986).

Figge also misled ISSB about his income by including the phantom capital gains on the "paper" sales. Overstating income by 40% is also material, particularly when the extra $4400.00 per month would have been more than enough to pay the accruing interest on the loans. The evidence left no doubt that the misrepresentations were knowingly and intentionally made.

There was no serious dispute that the debtors submitted the financial statement to induce ISSB to make the loans: the Figges knew that no application would mean no loan for them. The real issue under section 523(a)(2)(B) was whether ISSB reasonably relied on the financial statement. Debtors cite the doctrine that a "pure heart, empty head" approach to lending does not constitute reasonable reliance. *E.g., In re Bridges,* 51 B.R. 85 (Bankr.W.D. Ky.1985). In cases such as *Bridges,* the creditors typically have failed to conduct any investigation or to inquire into the creditworthiness of the debtor before advancing funds in otherwise ordinary credit transactions. That is not the case here.

■ What constitutes reasonable reliance depends on the circumstances. The general standard has been described in the case of *In re Harms,* 53 B.R. 134, 141 (Bankr.D.Minn.1985), as follows:

"The emerging standard of reasonableness requires the court to measure that creditor's actual conduct in the case at bar against three different factors: the creditor's standard practices in evaluating creditworthiness; the standards or customs of the creditor's industry in evaluating creditworthiness; and the surrounding circumstances existing at the time of the debtor's application for credit. (Citations omitted.)"

■ ISSB was a very small, unsophisticated bank operating a single location in a Kansas City area shopping center. The evidence established that it followed its usual procedures in running a credit check and found no problems or discrepancies to put it on notice that the financial statement was materially false. The procedures used were typical of similar small midwestern banks.

The dire economic condition of Figge's investments was intentionally camouflaged by use of the "net equity" and "capital gains" figures and was not obvious on the face of the financial statement. Significantly, the financial statement misrepresents that the partnership equity was not subject to debt. Even if ISSB had requested further backup, the paper trail was superficially in order. For example, Figge provided supplemental documentation of one of the "sale" transactions when he updated his financial statement in October. He intentionally omitted a crucial fact: the purchaser had already defaulted.

Days of detailed explanation at trial were required to figure out how the numbers were derived from Figge's intentionally labyrinthine real estate transactions, and to discern their true economic consequences in light of all the defaults and sham transactions. No bank in ISSB's position could be faulted for having failed to uncover the fraud reflected in the financial statement. Reasonable reliance upon a financial statement is established upon proof that (1) the lender has followed its regular credit investigation procedures; (2) those procedures are consistent with the generally prevailing credit practices for the other lenders of similar size and sophistication that operate in the same geographic market; (3) the credit investigation did not uncover any discrepancies or problems that suggested possible fraud or deceit. *See, e.g., In re Furimsky*, 40 B.R. 350, 355 (Bankr.D.Ariz. 1984). Lenders do not have to hire detectives before relying on borrowers' financial statements. As stated in *In re Garman*, 643 F.2d 1252, 1260 (7th Cir.1980):

"[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification. The law recognizes the duty of each to refrain from even attempted deceit of another with whom he deals, and the right of the later to assume that he will do so...' (Cite omitted)."

■ Debtors alternatively argue that ISSB should be estopped from relying on the financial statement because ISSB President Lemaster agreed to fund the loans without relying on financial statements. Although Lemaster did have side agreements with the Haiku group, the evidence does *not* establish that he waived the requirement of financial statements. On the contrary, he insisted on financial statements that met certain criteria on their face. There is no evidence that Lemaster knew Figge had submitted a materially false financial statement, or that he consented to it. Moreover, as a matter of law, a waiver of reliance would not be enforceable against the FDIC as discussed in part C below.

The evidence is clear and convincing that ISSB screened the applicants for the Haiku loans, including Figge, and denied loans to those applicants that failed to meet ISSB's standards for creditworthiness. In making the loans to Figge, the bank was also relying in part upon its security interest in the partnership shares, as well as guarantees by Daily and Winkler. Under the circumstances, ISSB's reliance on the Figges' financial statement was reasonable.

C. Nondischargeability Based Upon False Pretenses

■ The FDIC contends that the debt should also be held nondischargeable under section 523(a)(2)(A) because the Figges obtained the loans under false pretenses. The evidence is clear and convincing that the Figges did not personally intend to repay the loans at any time, although they knew they had a legal obligation on the personal notes. The evidence was also clear and convincing that the Figges could not afford to pay the $2417.00 in interest that accrued monthly on the loans, out of

their regular income of $4000.00 per month.

Section 523(a)(2)(A) excludes from discharge

"... any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ..."

The elements of a cause of action under this section were recently summarized in *In re Dougherty*, 84 B.R. 653, 656 (9th Cir. BAP 1988):

"1) that the debtor made representations;

"2) that at the time he knew the representations were false;

"3) that he made them with the intention and purpose of deceiving the creditors;

"4) that the creditor relied on such representations; and

"5) that the creditor sustained the alleged loss and damage as a proximate result of the representations."

In the loan documents that they both signed and submitted to ISSB, the Figges expressly represented that they would personally repay the loans when due in 12 months, unless the loans' maturity date was later extended. This Court has found that they had no intention to do so, and that their representations were knowingly false when made. The evidence also overwhelmingly established that the Figges intentionally participated in a scheme to deceive ISSB's federal banking regulators by entering into secret side deals with President Lemaster. That ISSB's losses on the Figge loans were the direct result of debtors' refusal to repay them is undisputed.

■ The Figges argue, however, that they had no intention to and did not deceive Lemaster, who was an active participant in the Haiku scheme. They contend that ISSB, and thus FDIC, is therefore estopped from establishing any misrepresentation justifying a judgment of nondischargeability. Lemaster knew that the more than 30 individual borrowers, including Figge, were in effect lending their financial statements to Haiku Holdings and Haiku Partners to get around the restrictions barring a multi-million dollar loan to those entities directly by ISSB. He agreed that the partnerships were supposed to be the principal source of repayment of the loans. He knew that many of the individual borrowers did not intend personally to repay them, although he tried to make sure that they could repay the loans if necessary. He made a side agreement to roll over the notes automatically for two years, even though that violated banking regulations.

The issue presented, then, is whether the defense of estoppel is effective against FDIC. FDIC asserts that the doctrine of *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), should be extended to bar such defenses in nondischargeability cases.

a. *D'Oench* and Proof of Reliance

In *D'Oench*, the maker of a note defended against collection by the FDIC on the ground that the note was given with a written side agreement that it need not be repaid and that any interest paid on account would be refunded. The president of the bank knew the notes were executed in this manner to make it appear that they were still "alive" and not past due. *Id.* 315 U.S. at 454, 62 S.Ct. at 678. The Supreme Court stated:

"Plainly one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners.... The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled." *Id.* at 460, 62 S.Ct. at 680.

Such notes were enforceable even against makers who did not intend to commit fraud

on anyone, as well as those engaged in active fraud. *Id.* at 458, 62 S.Ct. at 679.

The *D'Oench* doctrine protects FDIC against collusive secret deals between bank officers and borrowers. Its elements are now embodied in 12 U.S.C. § 1823(e), which provides:

> "No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee and (4) shall have been, continuously, from the time of its execution, an official record of the bank."

This statute entitles the FDIC to rely on the bank's loan documents and records essentially as a holder in due course. Side agreements are not enforceable unless they strictly comply with the statute. *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987).

The *D'Oench* doctrine is usually invoked in actions to collect upon notes that have been the subject of secret side deals or allegations of fraudulent inducement by the bank to the borrower. *See, e.g., FDIC v. First National Finance Co.*, 587 F.2d 1009 (9th Cir.1978). The kind of side deal at issue here—that the borrower does not have to personally repay the loans—is precisely the kind of arrangement rendered unenforceable against FDIC by the doctrine. *See, e.g., FDIC v. Berr*, 643 F.Supp. 357 (D.Kan.1986) (holding one of the Haiku limited partners personally liable on his $100,000.00 loan.)

■ Thus, *D'Oench* creates a presumption of reasonable reliance, rebuttable only by proof of compliance with 12 U.S.C. § 1823(e). Absent such proof, the element

of reliance required by Section 523(a)(2)(A) and (B) is satisfied upon documentary evidence from the debtor's loan file, showing the written terms and conditions of the loan agreement. In this case, these documents include: (a) the Figges' financial statement in support of their application for the loans; (b) the October up-date to that financial statement; (c) the "12 months' promissory note" (d) the Figges' letter to the bank confirming their agreement to be personally liable for payment; (e) notes by the bank's personnel reflecting the credit check; (f) the security agreements; and (g) evidence of the payment history. The only evidence of the side deals that appears in the Figges' loan file is an unsigned handwritten note indicating that the loans are to be a "strictly non-recourse not to the borrower," on William Lemaster's notepaper. There was no evidence that the side deals were approved by the bank's board of directors in compliance with 12 U.S.C. § 1823(c).

This is a classic case for application of the *D'Oench* doctrine to establish reasonable reliance and enforce the debt against the borrower. The inquiry under section 523, however, cannot end with a determination that the note would be enforceable against the debtor. Reliance is not enough. The debtor must still be proven to have the requisite intent to deceive in order for a debt to be held nondischargeable under section 523. *In re Boebel (FDIC v. Boebel)*, 79 B.R. 381, 385 (Bankr.N.D.Ill. 1987).

### b. *D'Oench* and Intent to Deceive

■ The Figges contend that they did not intend to, and in fact did not deceive William Lemaster about their intentions with respect to repayment; *i.e.*, he knew they did not intend to repay the notes themselves, and in fact consented to it. The evidence supports this contention. Figge did, however, knowingly and intentionally participate in a conscious scheme to deceive the bank regulators, of which his loans were a part. This intent was proven directly, not merely vicariously. The tape recordings of the investors meetings reflect his voice urging participation in the

Haiku scheme to evade ISSB's lending limits and to deceive the bank examiners who would review the paperwork in connection with the loans by trying to create the false impression that the Figge loans and others were separate, properly documented personal notes. Figge did not "merely lend himself" to this scheme to mislead the banking authorities; he was one of the instigators and primary beneficiaries of the scheme.

The Figges' misrepresentations did not injure Lemaster individually, but rather the creditors of the bank and FDIC as the bank's insurer. The nature of the injury was to create a personal debt that the Figges could not personally repay under any reasonable scenario. This Court will not immunize debtor's guilty conduct just because one of the bank's own officers was successfully solicited to help defraud the bank and the public. Such a result would be unconscionable. The "fresh start" promised by the Bankruptcy Code is intended for the honest debtor, *see Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915), not for those who perpetrate a massive fraud that plunges a small bank into insolvency.

The FDIC proved Figge's intent to deceive by overwhelming evidence. *D'Oench* satisfies the reliance prong of the test. The injury is manifest. The debt is nondischargeable under section 523(a)(2)(A).

### D. Nondischargeability for "Willful and Malicious Injury"

 The fraud established on this record is also nondischargeable as to Frederik Figge under the meaning of Section 523(a)(6), which excludes a debt from discharge if it is "for willful and malicious injury by the debtor to another entity or to the property of another entity." To prevail under this section, FDIC must meet the standard set forth in *In re Cecchini, supra*, 780 F.2d 1440, 1443 (9th Cir.1986):

"[W]hen a wrongful act such as conversion, is done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious'

even absent proof of a specific intent to injure."

The Haiku scheme defrauded the bank's creditors and FDIC out of millions of dollars. The debtor's speculative hope that somehow the real property in question would skyrocket in value and permit eventual repayment resembles the defense in *Cecchini* that the debtor did not intend permanently to deprive the creditor of its property. Figge clearly intended to raise millions of dollars based on the misrepresentations and fraud set forth above, to save his $2 million worth of Hawaiian real estate from foreclosure. Default was the reasonably foreseeable consequence of the scheme. There was no "just cause or excuse" for Figge's conduct; only the desperation born of business failure.

### E. "Innocent" Spouse Liability

 Kirsten Figge did not testify at trial. The parties stipulated that she had no active involvement in Figge's real estate affairs, but did sign the loan documents and provided a letter endorsement of the financial statement. She also signed the October 1982 letter updating their financial condition for the subsequent loans. All of the assets and liabilities in question were community property, and subject to this joint bankruptcy. The anticipated financial benefits would have flowed to both spouses, if the restructuring of the real estate partnership had worked.

*In re Lansford, supra*, 822 F.2d 902, 904 (9th Cir.1987), questioned whether a debt should be made nondischargeable as to a spouse *merely* because he or she happened to be married to someone who engaged in fraud, thereby benefitting the family financially. The Ninth Circuit held, however, that where the spouse was in fact a signatory on the defaulted financing agreement, the status of which constituted the material misrepresentation at issue, and also signed the documents containing the misrepresentation on which the creditor relied, a judgment of nondischargeability would be sustained.

Like the wife in *Lansford*, Kirsten Figge did take several key steps that warrant the

conclusion that the debt should be nondischargeable as to her under Section 523(a)(2)(A) and (B). First, she signed the loan documents and the letters confirming that the financial application was true and correct. Second, she knew or should have known that the Figges could not afford the interest payments accruing on the loans, given the family income. The only possible inference under the circumstances is that she, too, did not intend personally to repay the loans, but rather expected the partnership to pay. Third, she attended at least part of one of the investor meetings, so she had some familiarity with the purpose and circumstances of the loans. This is not a case where the spouse heard about the transaction only after the creditor sued. Her role in the overall scheme, however, was too peripheral to warrant a determination that the debt is also nondischargeable under Section 523(a)(6).

*Conclusion*

The Figges' debts to ISSB are thus nondischargeable. Pursuant to Bankruptcy Rule 7052, this memorandum of decision constitutes this Court's findings of fact and conclusions of law. Judgement shall be entered forthwith.