**In re Aristide Francis LEFEVE, Jr., Debtor.**

**FEDERAL DEPOSIT INSURANCE CORPORATION, Successor in Interest and Receiver for New Orleans Federal Savings and Loan Association, Plaintiff,**

**v.**

**Aristide F. LEFEVE, Jr., Defendant.**

**Bankruptcy No. 8807506SEG.
Adv. No. 880974 SC.**

United States Bankruptcy Court,
S.D. Mississippi.

May 28, 1991.

---

John F. Landrum, New Orleans, La., Hollis C. Thompson, Jr., Gulfport, Miss., for plaintiff.

R. Wayne Woodall, Gulfport, Miss., for defendant, debtor.

## OPINION

EDWARD R. GAINES, Bankruptcy Judge.

A complaint objecting to dischargeability of debts was filed by The Federal Savings and Loan Insurance Corporation as Receiver for New Orleans Federal Savings and Loan, and later substituted by The Federal Deposit Insurance Corporation, pursuant to section 523 of Title 11 of the United State Code. The matter was set for trial and heard by the Court.[1] Having considered the pleadings, briefs submitted by counsel and the evidence presented at trial, the Court finds that the debts which are the subject of these proceedings should not be discharged by the debtor, Aristide Francis Lefeve, Jr.

The Court has jurisdiction of the subject matter and of the parties to this proceeding pursuant to 28 U.S.C. § 1334, § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (I) and (O).

### I. FACTS

This adversary proceeding involves two loans made by New Orleans Federal Savings and Loan to Aristide F. Lefeve, Jr.: (1) a residential loan and, (2) a commercial loan in which Lefeve was a guarantor. The Court makes the following findings.

1. A petition for relief under Chapter 7 of Title 11 of the United States Code was filed by Aristide Francis Lefeve, Jr. on March 9, 1988.

2. An adversary complaint was filed by the Federal Savings and Loan Insurance Corporation, as Receiver for New Orleans Federal Savings & Loan Association, (NOF), wherein the Court was requested to

---

**1.** The complaint was set for trial and heard simultaneously with the complaint to determine dischargeability filed by the FDIC as Receiver for Crescent Federal Savings Bank in Adversary No. 880975 SC. The Crescent complaint alleged violations under 11 U.S.C. § 523(a)(2)(B) involving the same financial statement that is the subject of this proceeding. Portions of this opinion are taken from briefs filed by the parties in these cases.

determine certain debts of Lefeve to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B) and (a)(6).[2]

3. On March 1, 1984, Lefeve obtained a loan from New Orleans Federal in the principal amount of $261,000.00 for the purchase of a residence in Mississippi.

4. Lefeve subsequently defaulted on the loan and a consent judgment was entered against Lefeve for the remaining deficiency, and for damages for the improper filing of a Notice of Lis Pendens, in the United States District Court for the Southern District of Mississippi in the amount of $194,305.60 plus interest.[3]

5. The debtor's residential loan application indicated projected income for 1984 of $285,000.00, consisting of $15,000.00 base employment income, $100,000.00 bonuses, and $170,000.00 other income. The debtor's 1983 tax return showed total income of $122,703.79, consisting of $79,000.00 capital gains, $18,612.00 partnership income, and $25,000.00 fees. The debtor's 1984 tax return showed a loss of $81,004.00, consisting of $15,169.00 interest income, a business loss of $157,295.00, a $90,000.00 capital gain, and $28,878.00 other losses.

6. The contract for the sale and purchase of real estate signed by Lefeve on the residential loan shows a purchase price of $290,000 with a cash deposit by Lefeve of $10,000.00.

7. The residential loan application shows a cash deposit by Lefeve of $10,000.00.

8. The loan commitment agreement signed by Lefeve and dated February 14, 1984, shows a sales price of $290,000.00.

9. The HUD–1 closing statement signed by Lefeve shows a contract sales price of $290,000.00 and indicates $33,717.68 cash required from the borrower, Lefeve.

10. Without NOF's knowledge, *no cash* was, in fact, put up by Lefeve in this transaction, contrary to the recitations in the aforesaid contract, residential loan application and closing statement.

11. In a separate loan transaction, $500,000.00 was obtained from New Orleans Federal by Steven P. Drown on February 18, 1985, to acquire 103 lots from Rivers Bend, Inc., a corporation wholly owned by Lefeve.

12. In consideration for extending credit to Drown, Lefeve was required to execute a continuing guaranty in the amount of $250,000.00, and a financial statement to support the guaranty.

13. In a proceeding to enforce the guaranty, judgment was entered against Lefeve in the United States District Court for the Eastern District of Louisiana in the amount of $250,000.00 plus interest, attorneys' fees and costs.

14. Lefeve submitted a written financial statement in support of his guaranty to New Orleans Federal dated July 5, 1984, which he actually signed on December 10, 1984.

15. Lefeve entered a termination agreement dated August 28, 1984 with Longboat Development Corporation, The Sutton Road Company, Inc., L.J. Munna, III, and Harry C. Sherman, that terminated Lefeve's interests in various properties. A letter dated April 13, 1984, outlined the division of interests that resulted in the termination agreement.

16. At the time the financial statement was signed and delivered to New Orleans Federal, Lefeve no longer had any interest in certain properties listed as current assets in the statement including: (1) a 5.86 acre condominium site in Biloxi, Mississippi with a value of $1,275,000.00, (2) a one-third interest in property at Natchez Alley

---

**2.** After commencement of this proceeding the Federal Deposit Insurance Corporation substituted itself as the Receiver for New Orleans Federal pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, § 401(f)(2), 103 Stat. 183, 356 (1989). Accordingly, the Plaintiff in this proceeding will be referred to hereinafter as the Federal Deposit Insurance Corporation (FDIC).

**3.** This amount included damages for slander of title in the amount of $7,500.00. Judgment was previously entered in this adversary proceeding declaring the $7,500.00 plus interest and costs to be nondischargeable.

in New Orleans with a value of $173,-500.00, and (3) a house on Lot 15, Rivers Bend Subdivision, valued at $94,072.00.

17. Liabilities were owed by Lefeve that were not reflected on the financial statement including: (1) a mortgage on property on Interstate 10 in excess of $150,000.00, (2) a guaranty in favor of Northlake Federal Savings & Loan Association for a loan totalling $1,150,000 in connection with Brodie Island, (3) a continuing guaranty in favor of Audubon Federal Savings & Loan Association for a loan in the amount of $3,800,000.00, and (4) a guaranty in favor of Northlake Federal Savings & Loan for a loan of $75,000 to Leonard J. Munna, III and David Pyburn.

18. The financial statement showed Lefeve as the individual owner of properties which were actually owned by other legal entities, such as corporations and partnerships, in which he only held an interest.

19. With reference to the Drown loan, Lefeve was personally involved in the negotiations relating to the loan from New Orleans Federal.

20. A standard sales contract signed by Lefeve shows a purchase price on property to be purchased by the Drown loan funds of $630,000.00.

21. The loan disbursement statement shows Drown contributing $217,750.00 in cash toward the purchase price.

22. Without NOF's knowledge, Drown did not contribute *any cash* at closing of the loan from New Orleans Federal.

23. In the purchase transaction Lefeve obtained a $95,000.00 mortgage on the property and a 50% ownership in the corporation which was acquiring title to the property. The rights obtained by Lefeve in this transaction were not disclosed to NOF.

24. Lefeve was involved with several closings where cash contributions were to be made by the borrowers according to the loan closing documents, but which were not actually made.

25. An order was entered on January 25, 1989 stating that the Plaintiff's Requests for Admissions Nos. 1–10 are conclusively deemed admitted, Defendant having failed to respond within the time required by law. These admissions from FDIC requests to Lefeve include the following:

(1) That you met with representatives of New Orleans Federal Savings & Loan Association and discussed the terms of NOF's loan to Steven P. Drown so Drown could purchase property from your corporation, Rivers Bend, Inc.;

(2) Representatives of NOF told you that Drown could not obtain a loan in the principal amount of $500,000.00 unless you agreed to guarantee a portion of the loan;

(3) Before granting the $500,000.00 loan to Drown, NOF required that you submit a financial statement evidencing your assets and liabilities;

(4) Before granting the $500,000.00 loan to Drown, NOF required that you execute a continuing guaranty in the amount of $250,000.00 to secure the loan to Drown;

(5) During your conversations with NOF officials, you represented that Drown was purchasing the property from your corporation for the price of $717,500.00;

(6) Drown did not pay you $717,500.00 in cash to acquire the property;

(7) To purchase the property from your corporation Drown "paid" you the following: (1) $500,000.00 cash minus the costs of obtaining the loan from NOF; (2) a $95,000.00 mortgage payable to you and/or your corporation; and (3) fifty percent ownership in the corporation which was acquiring title to the property;

(8) The attached federal tax return for 1983 is a true copy of your personal tax return filed with the IRS for the year 1983;

(9) That NOF provided one hundred percent financing for you to acquire your residence on Rivers Bend Drive; and

(10) That you never submitted any payments to FSLIC in satisfaction of the $7,500.00 in damages specified in that Judgment rendered in the case entitled "Aristide F. Lefeve, Jr., et al. v. Hollis C. Thompson, Jr., as Substituted Trustee for the FSLIC and FSLIC as Receiver for

New Orleans Federal Savings and Loan Association," Civil Action NO. S87–0266(G) on the docket of the United States Bankruptcy Court for the Southern District of Mississippi, Southern Division.

## II. ISSUES

The issues for adjudication here are as follows:

(1). Did Lefeve obtain his residential loan by use of a materially false residential loan application in violation of § 523(a)(2)(B)?

(2). Did Lefeve obtain his residential loan under false pretenses and false representations regarding amounts of purchase price and cash contribution in violation of § 523(a)(2)(A)?

(3). Did Lefeve violate § 523(a)(2)(A) in obtaining the Drown loan by use of false pretenses and false representations re-, garding purchase price, cash contribution, and ownership retention?

(4). Did Lefeve violate § 523(a)(2)(B) in obtaining the Drown loan by use of a materially false financial statement respecting his financial condition?

(5). Did Lefeve violate § 523(a)(6) in obtaining the loans by use of a materially false financial statement respecting his financial condition?

Adjudication of nondischargeability as to the particular debt results from violation of any of these statutes.

## III. LAW

### A.

■ The Court first considers the actions against Lefeve relating to his residential loan. Section 523(a)(2)(B) of Title 11 of the United States Code provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ...

(2) for money, property, services, or an extension, renewal, or refinancing of creditor, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive ...

11 U.S.C. § 523(a)(2)(B). Section 523(a)(2)(B) applies not only to documents styled as "Financial Statements", but to any false statements made in written loan applications. *See, Personal Finance Co. v. Martinez*, 115 F.2d 226, 227 (10th Cir.1940); *In re Strapko*, 5 B.R. 443, 445 (Bankr. D.Minn.1980).

■ The burden of proof for establishing an exception to discharge under section 523(a) is now by a preponderance of the evidence and not by the stricter standard of clear and convincing evidence. *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ The debtor's residential loan application indicated projected income for 1984 of $285,000.00 when his 1983 tax return showed total income of $122,703.79 and his 1984 tax return showed a loss of $81,-004.00. In addition, Lefeve's testimony indicated that the base monthly income listed in his residential loan application was predicated on draws from The Sutton Road entity and on his legal practice, but that he stopped receiving the draws in January of 1984, before the loan was approved, and realized in January of 1984 that he would not be receiving anything more from Sutton Road.

Mr. Ashton Ryan, a CPA at Arthur Anderson & Company responsible for rendering opinions on financial statements, testified that the income information on the residential loan application could not be reconciled with the tax returns and that the differences in the income shown were material from the standpoint of an underwriter and lender. The discrepancy between incomes shows at a minimum a reckless disregard on the part of the debtor in his submission of information to NOF. Testimony from Lefeve indicated that at the

time of the loan transaction the construction loan on the house was maturing after cost overruns and that he needed permanent financing.

In *In re Jordan*, 927 F.2d 221 (5th Cir. 1991), the Fifth Circuit stated that:

A materially false statement is one that "paints a substantially untruthful picture of a financial condition by representing information of the type which would normally affect the decision to grant credit." (citations omitted). Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is "whether the lender would have made the loan had he known the debtor's true situation." *In re Bogstad*, 779 F.2d 370, 375 (7th Cir.1985).

927 F.2d at 224. The income information presented in Lefeve's residential loan application represented a materially false statement respecting his financial condition.

▇▇▇ In regard to the element of reliance, Lefeve takes the position that the bank based its loan on appraisal values and that it did not in any way rely on any financial statements or loan applications that were requested or submitted. Ryan testified emphatically that income is of primary importance in the evaluation of a residential loan. Additionally, Hughes Drumm, a member of the board of directors for New Orleans Federal, testified that the income of a borrower was an important matter in determining whether a loan would be approved and that the loan committee relied on the income shown on Lefeve's residential loan application. The Court finds that the element of reliance was established by the evidence presented in this case. Additionally, the Court holds that even in the absence of this proof, reliance may be presumed as a matter of law given the posture of the FDIC as a party and the application of the *D'Oench, Duhme* doctrine, as discussed below.

Under the case of *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*,

315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its progeny, the receiver of a federally insured bank or savings and loan association is protected from defenses based on side agreements or understandings not in the official papers of the failed institution. *D'Oench* has been applied to foreclose factual disputes concerning reliance under § 523(a)(2).[4] In *In re Cerar*, 97 B.R. 447 (C.D.Ill.1989), the District Court stated:

Normally, the existence of the element of reliance which must be established in order to prevent discharge of a debt depends upon whether the creditor actually relied on the debtor's representation when loaning money or providing services. However, the situation is different where the debtor's fraud was performed in conjunction with his creditor for the purpose of deceiving banking examiners and ultimately the FDIC.

97 B.R. at 449. See also, *In re Figge*, 94 B.R. 654, 665 (Bankr.C.D.Cal.1988). Further, in *In re Bombard*, 59 B.R. 952 (Bankr.D.Mass.1986) the Court held that reliance required by § 523(a)(2)(A) was furnished by the federal statute and the federal common laws which entitled the FDIC to rely on the bank records. The Court specifically found that proof of the bank's reliance itself was unpersuasive, but stated that the deficiency in proof was of little consequence because the FDIC was entitled to rely on the debtor's signature as a matter of law. 59 B.R. at 954.

▇▇▇ Courts generally agree that the creditor must show that it considered and relied on the actual financial statement in question. *In re Dawson*, 16 B.R. 70, 73–74 (Bankr.E.D.Va.1981). However, it is true that "lenders do not have to hire detectives before relying on borrower's financial statements." *In re Figge*, 94 B.R. 654, 666 (Bankr.C.D.Cal.1988). *See also, In re Garman*, 643 F.2d 1252, 1260 (7th Cir.1980).

In *In re Figge*, supra, the Court held that the doctrine of *D'Oench, Duhme & Co. v.*

---

**4.** The element of reasonable reliance is the same under sections 523(a)(2)(A) and (B). *In re Turner*, 1989 WL 105750 (Bankr.N.D.Ill.1989). *In re Howarter,* 95 B.R. 180 (Bankr.S.C.Cal. 1989), *aff'd,* 114 B.R. 682 (9th Cir. BAP 1990). Therefore, the cases dealing with either section are authoritative on the element of reliance here.

*Federal Deposit Insurance Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), "creates a presumption of reasonable reliance" by the FDIC in its objection to discharge of a debtor based on § 523(a)(2)(A) and (B). The Court stated that, "the element of reliance required by Section 523(a)(2)(A) and (B) is satisfied upon documentary evidence from the debtor's loan file, showing the written terms and conditions of the loan agreement". 94 B.R. at 668. In *Figge*, the Court found that the documents contained in the loan file satisfied the element of reasonable reliance. They included: (1) the debtor's financial statement submitted in support of his application for the loan, (2) the promissory note, (3) notes by the bank's personnel reflecting a credit check, (4) the security agreement, and (5) evidence of payment history.

The documentation in the Lefeve loan file of NOF includes the following: (1) financial statement, (2) adjustable rate note, (3) deed of trust, and (4) evidence of verification and credit checks. Documentation shows that Lefeve represented to NOF in February of 1984 that his 1983 income had been $186,000.00. This was not true. His 1983 income had been only $122,703.79.

The Fifth Circuit recently expounded on the extensive application of the *D'Oench, Duhme* doctrine in *Bowen v. Federal Deposit Ins. Corp.*, 915 F.2d 1013 (5th Cir. 1990)[5] as follows:

> The original *D'Oench* case applied only to a secret agreement used as a defense to a suit on a note by FDIC in its corporate capacity ... [T]he doctrine has evolved to a rule that today is expansive and perhaps startling in its severity. The doctrinal extension we describe is considerable, but we believe experience has been a wise teacher.
>
> The modern *D'Oench* rule protects the FDIC, as receiver of a failed bank or as purchaser of its assets, from a borrower who has " 'lent himself to a scheme or arrangement' whereby banking authorities are likely to be misled." *Beighley v.*

*Federal Deposit Ins. Corp.*, 868 F.2d 776, 784 (5th Cir.1989) (quoting *D'Oench* ). In particular, *D'Oench* bars the use of unrecorded agreements between the borrower and the bank as the basis for defenses or claims against the FDIC ... Simply put, transactions not reflected on the bank's books do not appear on the judicial radar screen either ...

915 F.2d at 1015–16.

The evidence in this matter is abundantly clear that Lefeve, at a minimum, "lent himself to a scheme or arrangement whereby banking authorities are likely to be misled". His own testimony indicates an intimate knowledge of loose banking practices among financial institutions with which he dealt during the period of time involving the transactions at issue. Even with this knowledge, Lefeve chose to participate in the practices for his own pecuniary gain. Given his experience as a real estate developer and attorney with extensive knowledge in lending policies and practices, it can be unquestioned that Lefeve knew the reasoning behind banking regulations of federally insured institutions that required accurate financial statements and other documentation to be included in a borrower's loan file. Thus, even if Lefeve could prove that the actual lending officials with which he conducted his business did not rely on any financial statements he submitted before granting him a loan, he would not be able show that bank regulators, auditors, or receivers, up the line, should not be entitled to rely on the truth on those documents. The facts of this case provide the very type of scenario which is intended to be covered by the doctrine of *D'Oench, Duhme* in the protection of the FDIC as an insurer. On this basis, the Court concludes that documentation in Lefeve's loan file satisfies the element of reliance by application of the doctrines announced in *D'Oench, Duhme,* and *Figge* as cited above.

■ On the element of intent to deceive under section 523(a)(2), the Court in *Briga-*

---

**5.** Although not a decision dealing with dischargeability in bankruptcy, this opinion is instructive on policy and application of the *D'Oench, Duhme* doctrine.

*dier Homes v. Hert,* 81 B.R. 638 (Bankr. N.D.Fla.1987) stated the following:

> Intent may be inferred from the surrounding circumstances. (citations omitted). Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent. (citations omitted) ... Hert made these willful misrepresentations which he should have known would induce these parties to enter into the financial and contractual relationship with him, thus his intent to deceive the plaintiffs may be inferred. *Carini v. Matera,* 592 F.2d 378 (7th Cir.1979).

81 B.R. at 641.

Additionally, in *In re Barrett,* 2 B.R. 296, 301 (Bankr.E.D.Pa.1980), the Court stated that it will not shield an intelligent, educated businessman, who had ample opportunity to read what he signed, from his own carelessness, especially in light of his extensive dealings with banks. Lefeve is an experienced attorney, a real estate speculator and is sophisticated in real estate financings and underwriting criteria. His testimony reflects a very high degree of business acumen and familiarity with loan transactions and lending practices. In *In re Jordan, supra,* the Fifth Circuit stated that:

> Nevertheless, *[In re] Icsman* [64 B.R. 58 (Bankr.N.Ohio 1986) ] is not so far afield as to discredit its message: that debtors with business acumen, like the Jordans, are to be held to a higher standard. *See also In re Mutschler,* 45 B.R. 482 (Bankr.D.N.D.1984) ("Where the debtor is an individual of intelligence and experience in financial matters, courts have been more inclined to hold them responsible for uttering a false financial statement") ... [O]ur review of the record convinces us that the bankruptcy judge was well within his discretion in inferring an intent to deceive from the circumstances surrounding the preparation and submission of the Jordans' financial statements.

927 F.2d at 226. The Court finds, given the size of the discrepancy misrepresented and the experience and intelligence of the debtor, that the element of intent has been established by the evidence in this matter.

The Court notes, additionally, that malfeasance has been specifically rejected by the Fifth Circuit as a requirement for application of *D'Oench, Duhme,* thus determining the borrower's good faith irrelevant. In *Bowen v. Federal Deposit Ins. Corp.,* the Court stated:

> In an attempt to escape the dungeon of Duhme, the Bowens raise a number of claims. Principally, they argue that *D'Oench, Duhme* requires "malfeasance" on the part of the borrower ... [O]ur more recent holdings explicitly disavow a requirement of malfeasance:
>
> > We can dispense easily with [the] contention that the *D'Oench, Duhme* rule bars only claims or defenses based upon illegal side agreements entered into for the purpose of deceiving banking authorities.... [T]he Court [in *D'Oench, Duhme* ] suggested that [the rule applies] even [to] a borrower who ... did not "intend[ ] to deceive any person".... Hence, it is irrelevant ... whether [the borrower] acted in good faith ...
>
> The lack of a malfeasance requirement makes *D'Oench, Duhme* a sharp sword and sturdy shield indeed. What is the purpose of such imposing armaments? Fundamentally, *D'Oench* attempts to ensure that FDIC examiners can accurately assess the condition of a bank based on its books. The doctrine means that the government has no duty to compile oral histories of the bank's customers and loan officers. Nor must the FDIC retain linguists and cryptologists to tease out the meaning of facially-unencumbered notes. Spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for a bank's unrecorded liabilities. Perhaps mindful of the fate that befell the Baker, whose search for the Snark ended with his own disappearance, *D'Oench, Duhme* seeks to ensure that a bank's assets do not "softly and suddenly vanish away." (footnote omitted)

The dangers of a contrary policy should be obvious. Today, stable financial institutions sometimes seem as elusive as the Snark. Unrecorded agreements—those rooted in the loose soil of casual transactions as much as those that spring from the malodorous loam of outright fraud—are a threat to the ecology of the banking system that we can ill-afford. To check the growth of these hardy perennials, *D'Oench* forces borrowers to bear the risk that their unorthodox plants will bear no fruit. Those who till these soils may not shift the cost of their peculiar agronomy to the FDIC, the bank's depositors and unsecured creditors, and the taxpayers and depositors who fund the FDIC. (citations omitted).

As to the Bowens' malfeasance requirement, we would decline to adopt it even in the absence of precedent. Adulterating *D'Oench, Duhme* would amount to abandoning a bedrock protection for the uncertainty of quick-clay, a seemingly stable substance notorious for its rapid liquefaction. The firm resolution we provide today would collapse into an uncertain and fact-bound inquiry, soon to be followed by a landslide of "good faith" claims against the FDIC. We are not willing to remake the topography of the banking system in such a fashion. Nor, apparently, is Congress, which has directed the courts to void unrecorded agreements against the interests of FDIC–Receiver without regard to malfeasance ... Accordingly, we reaffirm our earlier holdings: the *D'Oench, Duhme* doctrine is applicable even in the absence of malfeasance.

As an alternative to their malfeasance requirement, the Bowens suggest that *D'Oench* requires at least recklessness or negligence on the part of the borrower. They cite no authority for this proposition, however, and we do not regard it as consistent with our precedent or our holding today.

915 F.2d at 1016–17.

Based on the evidence presented, the Court finds that the elements necessary to establish an exception to discharge under section 523(a)(2)(B) in regard to the debtor's residential loan have been satisfied by the FDIC.

### B.

■ The Court next considers the application of 11 U.S.C. § 523(a)(2)(A) in connection with Lefeve's residential loan at New Orleans Federal. This section provides that:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt ...

(2) for money, property, services, or an extension, renewal, or refinancing of creditor, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). To except a debt from discharge based on false pretenses, the law imposes five requirements: (1) a representation by the debtor, (2) which was materially false, (3) which the debtor knew to be false at the time it was made, (4) made with the intention and purpose of deceiving the creditor, (5) which was relied upon by the creditor, and (6) as a result of which money, property, or services, or an extension, renewal, or refinancing of credit was obtained. *See In re Cerar*, 97 B.R. 447 (C.D.Ill.1989); *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985); *In re Houtman*, 568 F.2d 651, 655 (9th Cir.1978); *In re Lamb*, 28 B.R. 462, 464 (Bankr.W.D.La. 1983); *In re Brewood*, 15 B.R. 211, 214 (Bankr.D.Kan.1981).

■ The debtor represented to New Orleans Federal that the purchase price of the residence was $290,000.00 and that he would contribute over $33,000.00 in cash. New Orleans Federal actually and unknowingly provided 100% financing for Lefeve to acquire his residence in loaning $261,-000.00 to Lefeve, because no cash was contributed by Lefeve in the transaction.

The CPA, Ashton Ryan, testified that a lender wants proof of an owner's personal financial stake in property and that failure to pay cash is material to the lender.

Knowledge of Lefeve's failure to pay cash would have raised suspicions at NOF whether the transaction was arms-length and whether the purchase price accurately indicated or supported value.

The loan file indicates records that were relied upon by New Orleans Federal included the following:

(1) Contract for the sale and purchase of real estate showing a purchase price of $290,000.00 with a cash deposit from Lefeve of $10,000.00,

(2) Residential loan application showing a cash deposit of $10,000.00 from Lefeve,

(3) Loan commitment showing a sales price of $290,000.00,

(4) Loan authorization to attorney enclosing the sale agreement,

(5) Closing statement showing contract sales price of $290,000.00 and cash contribution by Lefeve of over $33,000.00.

Ryan testified that from a review of the residential loan file, NOF relied on the representation that a cash contribution was being made. Hughes Drumm testified that NOF had a policy against making 100% loans and required cash contributions from borrowers. Based on the evidence presented at this trial, the Court finds that FDIC has met its burden of proving by a preponderance of the evidence the elements necessary to establish an exception to discharge under section 523(a)(2)(A) in regard to the debtor's residential loan. Additionally, the Court notes that the element of reliance, although proven here, is presumed under the application of *In re Figge*, and *In re Cerar*, as cited in the above discussion.

### C.

The Court next turns to the issues relating to the Drown loan. The FDIC alleges entitlement to a determination of nondischargeability pursuant to § 523(a)(2)(A) in connection with this loan.

 It was represented to NOF that the loan to Steven Drown was to include a sizeable cash contribution from Drown in the amount of $217,500.00 on a purchase price of $717,500.00. The failure to put up cash for the loan, and the failure to dis-

close to NOF that Lefeve was retaining an ownership interest in the property and a mortgage from Drown, were material differences in the loan package as presented. A false representation may be passive. *See In re Gitelman*, 74 B.R. 492, 495 (Bankr.S.D.Fla.1987); *In re Lamb*, 28 B.R. 462, 564 (Bankr.W.D.La.1983); *In re Thomas*, 12 B.R. 765, 769 n. 9 (Bankr. N.D.Ga.1981). Testimony from Ryan and Drumm further indicates that these changes would be very important and material to an underwriter or loan committee member in evaluating the loan, since the borrower would have no personal stake in the property and the transaction would not be at arms length.

Ryan further testified that an underwriter relies on a borrower's cash contribution and that a bank auditor reviewing Lefeve's loan file would believe cash had been contributed. The file included the sales contract and the loan disbursement statement.

Lefeve was instrumental in the negotiations for the loan and attended all meetings concerning the loan. Drown became involved through Lefeve at a time when Lefeve did not think he could personally go to NOF for the loan in his name because he might have a problem with excessive loans to one borrower. Lefeve was most anxious to sell his property. The Fifth Circuit noted in *In re Jordan* that a bank may place reliance on data from a customer who is accompanied by a regular and well known customer.

> [W]e are ... convinced that Southeast's reliance on the Jordans' data, although perhaps not the most prudent of banking practices, was not unreasonable. Incontestably, in early 1985 the Jordans' faces were new and unfamiliar to Southeast executives. The couple was, however, accompanied by and seeking to purchase land from Deceteau, a regular and well known customer with substantial Southeast deposits.

927 F.2d at 225.

Based on the evidence presented, and law cited above, the Court finds that the burden of proving the elements necessary to establish an exception to discharge under

section 523(a)(2)(A) in regard to the Steven Drown loan have been met by the FDIC.

### D.

▮ The FDIC further contends a violation of § 523(a)(2)(B) in connection with the Drown loan by use of a materially false financial statement. The financial statement that is the subject of this proceeding was dated July 5, 1984, and submitted to New Orleans Federal on December 10, 1984. Section 523(a)(2)(B), as stated above, prevents discharge where the debtor has obtained money by use of a statement in writing respecting the debtor's financial condition, that is materially false, on which the creditor reasonably relied, and that the debtor published with intent to deceive.

The financial statement here showed numerous assets that Lefeve either never owned in his individual name, or had any interest in at the time of submission of the statement. The financial statement failed to disclose substantial contingent liabilities although the statement was very detailed, and contained supplementary explanatory notes. Ashton Ryan testified that the level of detail in Lefeve's financial statement was exemplary. The debtor argues that a general comment preceding the statement to the effect that the debtor may have contingent liabilities in the event of default of a partner was sufficient to put the reader on notice that he should ask questions. The differences between Lefeve's actual financial condition and that shown on his financial statement were material and should have been disclosed without interrogation or investigation by NOF. *See, Bowen v. Federal Deposit Ins. Corp.*, 915 F.2d 1013, 1016 (5th Cir.1990) (spreadsheet experts need not be joined by historians, soothsayers, and spiritualists in a Lewis Carroll-like search for unrecorded liabilities). It is noted by the Court that it took several days of testimony for Lefeve himself to attempt to explain discrepancies in his own financial statement.

Lefeve tried to persuade the Court that after all corrections were made in his financial statement to reflect the actual assets and liabilities as of the date the financial statement was submitted, the misrepresentation in his overall net worth was not material and his financial condition was actually better than that shown. The Court holds that the evidence of material discrepancy in Lefeve's financial statement by overvaluing assets and undervaluing liabilities is overwhelming, particularly when the extensive detail and supplemental explanatory notes included as a part of the "exemplary" statement are considered. Additionally, the evidence submitted by Lefeve in attempting to show that his assets were greater than that shown was not sufficiently substantiated or persuasive. Where a financial statement contains numerous material misrepresentations of the kind depicted in Lefeve's financial statement, the debtor should not be allowed to claim a counterbalancing effect by showing yet additional discrepancies that appear to favor the debtor's overall financial condition. In *In re Jordan*, 927 F.2d 221 (5th Cir.1991), the debtors attempted to use this rationale:

> The Jordans begin by denying that they provided Southeast with data that were materially false. They admit that their balance sheets and supplementary statements omitted several of their own and their corporation's liabilities, but assert that certain assets used to secure these liabilities were also excluded from these documents. As they see it, the unmentioned assets were approximately equivalent in value to unmentioned liabilities. Thus, they conclude, the omissions did not render their data materially untrue, because the data gave an essentially accurate portrayal of their aggregate net worth....

A materially false statement is one that "paints a substantially untruthful picture of a financial condition by representing information of the type which would normally affect the decision to grant credit." ... Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is "whether the lender would have made the loan had he known the debtor's true situation." (citation omitted). Finally, it is well-established that writings with per-

tinent omissions may qualify as "materially false" for purposes of § 523(a)(2)(B). (citation omitted).

With these principles as a backdrop, we reject the Jordans' argument for two independent reasons. First, the couple has failed to substantiate their assertion that the omitted liabilities were accompanied by omitted assets.... Second, even if the Jordans' assertions were borne out by the record, the data they submitted to Southeast were materially false for reasons wholly apart from omitted liabilities. Stated another way, the missing liabilities on the Jordans' balance sheets and supplementary statements were but the tip of the proverbial iceberg.... We thus agree with the bankruptcy court that the Jordans provided Southeast with written financial documents that were "materially false."

927 F.2d at 224.

Additionally, the debtor raises the argument that the termination agreement that divested him of properties in August of 1984 was not recorded at the time of submission of the financial statement, and thus the property was still technically his and disclosure was not necessary. He further stated that he only updated his financial statement every six months. In *In re Duncan*, 81 B.R. 665 (Bankr.M.D.Fla.1987) the Court stated that:

Demonstrating the debtors submitted the application and financial statement with the intent to deceive does not require a showing of actual knowledge of the falsity of the two documents. (citations omitted).

A creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of the accuracy of the information in the financial statement of the debtor. (citations omitted). While it is apparent the debtors and [third party purchaser] believed the debtors retained some sort of ownership interest in the real property, it is just as apparent the debtors recklessly disregarded the fact some interest may have been conveyed to [third party purchaser] by quit claim deed. The debtors knew that by failing to mention the transfer by quit claim deed, the financial statement and application were inaccurate. Thus, this element of Section 523(a)(2)(B) is met by clear and convincing evidence. In passing, the court would note there is sufficient evidence to establish this burden on the "Half Truth" doctrine. (citations omitted).

81 B.R. at 668. Additionally, the Court in *Brigadier Homes v. Hert*, 81 B.R. 638 (Bankr.N.D.Fla.1987) stated the following:

The element of intent must finally be addressed. Intent may be inferred from the surrounding circumstances. (citation omitted). Reckless disregard for the truth or falsity of a statement combined with the shear magnitude of the resultant misrepresentation may combine to produce the inference of intent. (citations omitted). This court finds Hert's nondisclosure of his limited ownership interest in the California property and his failure to amend the property value listed for the Indiana property upon learning of its over-inflated worth to be, at the least, reckless statements constituting willful misrepresentations. Hert made these willful misrepresentations which he should have known would induce these parties to enter into the financial and contractual relationship with him, thus his intent to deceive the plaintiffs may be inferred. *Carini v. Matera*, 592 F.2d 378 (7th Cir.1979).

81 B.R. at 641.

In *In re Barrett*, 2 B.R. 296, 301 (Bankr. E.D.Pa.1980), the Court stated that it will not shield an intelligent, educated businessman, who had ample opportunity to read what he signed, from his own carelessness, especially in light of his extensive dealings with banks. *See also, In re Jordan*, 927 F.2d 221, 226 (5th Cir.1991).

Lefeve's testimony indicated that he knew NOF conditioned the Drown loan on his guaranty and that a financial statement was required. Ashton Ryan testified that an underwriter relies heavily on a financial statement and especially one that was as well prepared as Lefeve's. He testified that the level of detail in Lefeve's financial

statement was exemplary. Ryan stated that a financial statement that was not current and that did not reflect material changes would not be meaningful to a lender or underwriter. Ryan concluded that NOF in fact relied on the financial statement. Hughes Drumm further testified that the loan committee relied upon financial statements as a matter of course.

As discussed previously, application of the *D'Oench, Duhme* doctrine may be used to foreclose factual disputes concerning reliance under section 523(a)(2). Under *Figge, supra,* the Court held that the doctrine of *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), "creates a presumption of reasonable reliance" by the FDIC in its objection to discharge of a debtor based on § 523(a)(2)(A) and (B). The Court stated that, "the element of reliance required by Section 523(a)(2)(A) and (B) is satisfied upon documentary evidence from the debtor's loan file, showing the written terms and conditions of the loan agreement". 94 B.R. at 668. Documents included in the Drown loan file of NOF included: (1) purchase money adjustable rate deed of trust note, (2) purchase money land deed of trust, (3) financial statement, and (4) evidence of verification.

Based on the evidence presented, and on the law cited in this opinion, the Court finds that the burden of proving the elements necessary to establish an exception to discharge under section 523(a)(2)(B) in regard to the Steven Drown loan have been met by the FDIC. Additionally, the Court notes that the element of reliance, although proven here, is presumed under the application of *In re Figge* and *In re Cerar,* as previously cited.

### E.

Additionally, the FDIC alleges violation of § 523(a)(6) by Lefeve's submission of the.

6. The Court notes that in certain materials submitted to the Court, FDIC claims violation of § 523(a)(6) in connection with the § 523(a)(2)(A) false pretenses allegation on the Lefeve residential loan, and on the § 523(a)(2)(A) allegation on the Drown loan. However, on page 12 of the Complaint, the FDIC alleges that Lefeve's debt in connection with the Drown loan should be excepted from

materially false financial statement in connection with the Drown loan.[6] Section 523(a)(6) provides that:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity ...

11 U.S.C. § 523(a)(6).

In *In re Fondren,* 119 B.R. 101 (Bankr. S.D.Miss.1990), this Court addressed the requirements for a willful and malicious injury under section 523(a)(6):

> The court next considers whether a violation of section 523(a)(6) occurred thus rendering the debt to Guaranty Corporation nondischargeable. As stated above, section 523 provides that a discharge under section 727 does not discharge an individual from any debt for willful and malicious injury to another entity or to the property of another entity. In *In re Hendry,* 77 Bankr. 85 (Bankr.S.D.Miss.1987), the following was stated:
>
> > [T]he legislative history of § 523(a)(6) provides in the Committee Reports of the United State House of Representatives and Senate that:
> >
> > > Paragraph (6) excepts debts for willful and malicious injury by the debtor to another person or to the property of another person. Under this paragraph, "willful" means deliberate or intentional. To the extent that *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1902 [1904]), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled. (citations omitted).

discharge because Lefeve executed and delivered to NOF a materially false financial statement respecting his financial condition, in violation of § 523, including, without limitation, § 523(a)(2)(B) and § 523(a)(6). Thus, the Court will restrict discussion on the § 523(a)(6) issue to the financial statement submitted in connection with the Drown loan.

It is clear from the legislative history that "willful" means a deliberate or intentional action. However, a question remains as to the meaning of the term "malicious." The definition of the term has been inconsistent by the Courts and thus two standards have evolved.

One line of cases requires an act with an actual, conscious intent to cause injury or harm to the creditor. (citations omitted). This line of cases ... encourages the Court to adopt this higher standard of the debtor having to have the conscious intent to harm ...

A second line of cases has continued to adopt the Tinker standard of implied or constructive malice and requires an intentional act which results in injury or harm to the creditor ... (citations omitted).

This Court finds that the standard adopted by the United States Fifth Circuit Court of Appeals, which is controlling here, is the interpretation of "willful and malicious" set forth in *Collier on Bankruptcy*, the leading bankruptcy treatise. See *Vickers v. Home Indemnity Company, Inc.*, 546 F.2d 1149 (5th Cir.1977); *Matter of Dardar*, 620 F.2d 39 (5th Cir.1980); *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241 (5th Cir.1983); *Matter of Quezada*, 718 F.2d 121 (5th Cir. 1983). *See also, In re Cecchini*, 780 F.2d 1440 (9th Cir.1986). *Collier* provides:

> In order to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence or personal hatred, spite or ill-will. The word "willful" means "deliberate or intentional," a deliberate and intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

3 *Collier on Bankruptcy*, 523.16 at 523–128 (15th ed. 1983).

Thus, when a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is "willful and malicious" even absent proof of a specific intent to injure. *Cecchini* at 1443.

77 B.R. at 89–90.

119 B.R. at 104–05.

In *In re Cerar*, 97 B.R. 447 (C.D.Ill. 1989), the FDIC brought an action under § 523(a)(2)(A) and (a)(6) seeking to prevent discharge of a forged note. The court stated:

> In order to establish a case under this section, the FDIC must prove three elements: (1) a willful and malicious act, (2) done without cause or excuse, and (3) which leads to harm. *See, Matter of DeVier*, 57 B.R. 602 (Bkrcy.E.D.Mich. 1986).

The debtor does not dispute the bankruptcy court's finding that his action was willful but contends that it was not malicious. The bankruptcy court recognized that there are two lines of authority as to the legal standard for deciding what is a malicious act. One line requires an actual conscious intent to financially injure the creditor. (citation omitted). The other line adopts the less stringent standard of implied or constructive malice holding that where an act is deliberately and intentionally done with knowing disregard for the rights of another it falls within the statutory definition of malice even if there is an absence of malice toward the particular creditor ...

The bankruptcy court concluded that the less strict definition of malice ... is the better analysis. Accordingly, the court found that, because the debtor knew that the bank was subject to FDIC examination and that the forged note would be used to conceal his credit situation from bank examiners, and because the debtor proceeded in the face of that knowledge to deliberately and intentionally forge the note, his action was therefore malicious ...

[T]he court agrees with the bankruptcy court that the FDIC established by clear and convincing evidence that there was

no legally cognizable cause or reason for Cerar's forgery of the note.

There is also no doubt that Cerar's action led to harm to the FDIC. The purpose of bank regulations which establish lending limits to any one borrower is to protect the bank from lending excessive funds to any one borrower, so that in the event the borrower fails to repay, the bank will not be placed in financial difficulty. The FDIC insures deposits so that depositors will be paid in the event the bank fails. When Cerar forged the note which permitted the Bank to continue to retain the excess loans on its books, a situation of potential harm was created for both the Bank and the FDIC. This potential came to fruition when the Bank failed and the FDIC was forced to take over the Bank. Cerar's actions clearly contributed to the failure of the Bank, although they were not the sole cause, and they were clearly of the type which the regulation was intended to prohibit.

97 B.R. at 451, 453.

 The Court has previously determined that Lefeve's submission of the false financial statement in connection with the Drown loan was intentional. As previously cited, intent may be inferred from the surrounding circumstances. See *Brigadier Homes v. Hert*, 81 B.R. 638 (Bankr. N.D.Fla.1987). Additionally, Lefeve's testimony indicated that the reason for introducing Drown to New Orleans Federal was because he believed that he may have had excessive loans himself, thus Drown's participation was, in essence, intended as a further extension of credit for Lefeve's own benefit. This type of activity is the kind the banking regulations were specifically intended to prohibit. The overall course of conduct exhibited by Lefeve in the Drown loan transaction evidences that his acts were intentional.

The submission of the false financial statement was, in the opinion of this Court, the type of activity that produces harm to the creditor by aiding in the false depiction of a sound loan from a secure institution. As in the case of *Cerar*, Lefeve's actions contributed to the failure of New Orleans Federal. Based on this analysis, the Court finds that the requirements for a willful and malicious injury under section 523(a)(6) have been satisfied by the FDIC in connection with the Drown loan.

## IV.

In summary, the Court concludes the following.

1. The debtor, Aristide Francis Lefeve, Jr., obtained his residential loan under false pretenses and false representations in violation of § 523(a)(2)(A), and by the use of a materially false financial statement in violation of § 523(a)(2)(B). Therefore, Lefeve's indebtedness to the FDIC in connection therewith is nondischargeable.

2. Lefeve obtained the Drown loan in violation of § 523(a)(2)(A) by the use of false pretenses and false representations, and in violation of § 523(a)(2)(B) by the use of a materially false financial statement. Therefore, Lefeve's indebtedness to the FDIC in connection therewith is nondischargeable.

3. Lefeve violated § 523(a)(6) in obtaining the Drown loan by the use of a materially false financial statement respecting his financial condition. Therefore, Lefeve's indebtedness to the FDIC in connection therewith is nondischargeable.

This opinion shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

A separate judgment will be entered by the Court pursuant to Bankruptcy Rule 9021 and Federal Rule of Civil Procedure 58. Counsel for FDIC is requested to submit a proposed form of judgment setting forth the correct computation of interest, fees and costs, as awarded in the District Court actions, within 21 days of the date of entry of this opinion.