In re Wendell Glenn BLOUNT.

INDUSTRIAL DESIGN ASSOCIATES, Plaintiff,

v.

Wendell Glenn BLOUNT, Defendant.

MISSISSIPPI DURABLE MEDICAL EQUIPMENT and Wendell Glenn Blount, Plaintiffs,

v.

INDUSTRIAL DESIGN ASSOCIATES, Defendant.

Bankruptcy No. 91–21761.

Adv. Nos. 91–2239, 92–1148.

Civ. A. No. WC89–130–D–D.

United States Bankruptcy Court, N.D. Mississippi.

Feb. 3, 1993.

Jeffery M. Navarro, Aberdeen, MS, for Wendell Glenn Blount and Mississippi Durable Medical Equipment.

Robert H. Faulks, Holcombe, Dunbar, Connell, Chaffin & Willard, Aberdeen, MS, for Industrial Design Associates.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is a complaint seeking to deny the dischargeability of debts filed by the plaintiff, Industrial Design Associates, against the debtor, Wendell Glenn Blount, as well as, a complaint for damages filed by Mississippi Durable Medical Equipment, Inc., and Wendell Glenn Blount against Industrial Design Associates (the latter complaint having initially been filed in the Circuit Court of Calhoun County, Mississippi, then removed to the United States District Court for the Northern District of Mississippi, and then ultimately transferred to this court for adjudication); responsive pleadings and affirmative defenses having been filed to both complaints, including a counterclaim filed by Industrial Design Associates against Blount, all of which were consolidated for hearing; and the court having considered same, hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the parties to and the subject matter of these proceedings pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. These are core proceedings as defined in 28 U.S.C. § 157(b)(2)(A), (B), (I), and (O).

### II.

### FACTUAL BACKGROUND

In August, 1988, Industrial Design Associates, hereinafter IDA, proposed to develop and build a three wheeled scooter prototype for use by marginally disabled individuals. The proposal was submitted to "Mississippi Medical" which could either be Mississippi Medical, Inc., its successor, Mississippi Durable Medical Equipment, Inc., or Medical Concepts, Inc., a third corporation formed specifically to produce the aforesaid scooter. All three of these corporations were owned by Blount. Because the

corporate structures of these entities were somewhat amorphous, they will be referred to in this opinion collectively as "Mississippi Medical" or "Mississippi Medical" entities.

Pursuant to the proposal, the prototype was delivered on schedule on November 2, 1988. Each phase of the proposal was invoiced monthly. IDA received payment for the services provided under the proposal with the exception of the last invoice, dated November 25, 1988, in the amount of $6,663.69.

After the delivery of the prototype, pursuant to verbal arrangements, IDA performed additional services relative to the development of the scooter for production. A second prototype was assembled in December, 1988, and three more prototypes were assembled in January, 1989. This work was also invoiced monthly. It was not disputed that the total of all of the unpaid invoices, including the earlier unpaid $6,663.69 invoice, amounted to $94,270.75.

Significantly, according to Mike Yardley, the former chief executive officer for IDA, the services performed under the original proposal, as well as, the subsequent work, which comprises the major portion of the outstanding indebtedness, were all invoiced to "Mississippi Medical." In addition, he indicated that the subsequent services were requested primarily by Ronald Mostich and Dave Kimbro, both employees of the "Mississippi Medical" entities. Sam Crosby, IDA's president, testified that there was no formal program between IDA and the "Mississippi Medical" entities after November 2, 1988.

After the formation of Medical Concepts, negotiations were undertaken to market the scooters through American Mobility, Inc., an Ohio corporation, whose principal owner was Saul Fesman. Although some scooters were sold through this arrangement, it apparently was terminated sometime in May, 1989.

After the prototype was unveiled, problems began to develop with the scooter when general production was attempted. IDA contended that the initial prototype was not intended to be used for production and was not to be considered as a production model. On top of this, IDA contended that the quality control measures utilized by "Mississippi Medical" were grossly deficient. IDA also indicated that some of the component parts being manufactured by third parties were substandard.

The testimony of two former employees of the "Mississippi Medical" entities, however, reveals several significant problems that were being encountered with the scooter. Excerpts are set forth as follows:

Clyde W. Henderson, formerly responsible for quality control at Medical Concepts, testified that several of the scooters shipped to American Mobility were returned because they were faulty. He indicated that the throttle control would stick, that there was slack in the handlebars which created steering problems, and that the seat was unstable. He indicated that the scooter needed thicker bolts to hold the main parts together, and that the battery slipped out of the battery box if the scooter were jarred. He stated that the plastic components did not fit well together, and that the tire clearance was too low.

Bedford Forrest "Buzz" Peoples, a former member of the management team at Mississippi Durable Medical Equipment, testified that the scooters initially were sold to American Mobility which, in turn, sold them to theme parks such as Disney World and Dollywood. Peoples said that the scooter finish was easily scratched, and that the component parts would not fit securely together. He recalled the following additional problems: the armrest would easily collapse; the handlebars were bent; the potentiometer, the scooter direction device and/or throttle, had an extremely short life span and would frequently stick; a paddle had to be redesigned so that it could not be wrenched off the scooter; there was difficulty in gluing the floor mats to the polyethylene floor pans; the seat would not stay in a stable and locked position; the material that was used for the battery boxes would fade in the sunlight and was not durable enough to withstand the battery acidity. Peoples testified that

scooters were manufactured until the Fall of 1989, but that production was very sporadic. He recalled having to make numerous modifications to the scooter, and said that most of the scooters that were sold in the first six months were returned. Significantly, he indicated that IDA was being furnished weekly reports which detailed the problems that were being encountered.

During this same period of time, IDA began to make requests for the payment of the outstanding invoices. In response to these collection efforts, on May 10, 1989, Attorney Henry Lackey, who was representing Blount and the "Mississippi Medical" entities, prepared and telefaxed to Mike Yardley at IDA the following:

Mike:

I have spoken with Wendell and he assured me that you would be paid in full on or before June 30, 1989. He is out of town today but said he had financing arranged and that it could be consummated next week and if so you would be paid next week, but if not, no later than June 30, 1989.

Please advise by return Fax if you can release the documents as previously requested.

Sincerely,

Henry L. Lackey

On receipt of this faxed letter from Lackey, IDA released certain patent documents, applicable to the scooters, that it had been holding. *The value of the patent documents, however, was never disclosed.* This presents a problematic evidentiary question for the court.

Based on the faxed letter, IDA contends that Blount personally guaranteed the obligations that had been incurred by the "Mississippi Medical" entities. At this time, according to the invoices, all of the $94,-270.75 indebtedness was past due. In the excerpt from his deposition, read into the record, Lackey indicated that Blount had told him to advise IDA that the debt would be paid. He also confirmed that the faxed letter was sent on Blount's instructions and that its contents were accurate.

When the June 30, 1989, deadline passed without the promised payment being made,

IDA continued negotiations with Lackey, but with no success. On August 21, 1989, IDA made a formal written demand for payment by certified mail. This letter also demanded attorney's fees pursuant to § 11–53–81, Miss.Code Ann. (1972) (Cum. Supp.1992). Immediately after receipt of the demand letter, on August 23, 1989, Blount and Mississippi Durable Medical Equipment, Inc., filed suit against·IDA in the Circuit Court of Calhoun County, Mississippi, alleging that the IDA invoices should not be paid because IDA had negligently designed the scooter. This lawsuit was removed to the United States District Court for the Northern District of Mississippi where IDA filed a counterclaim against Blount, seeking payment for the past due invoices, as well as, for compensatory and punitive damages, based on the contention that Blount's complaint was totally without merit and frivolous. Blount's complaint against IDA was subsequently dismissed with prejudice by United States District Court Judge Glen H. Davidson. On May 20, 1991, coincidentally, the date that the trial on IDA's counterclaim was scheduled to begin in the district court, Blount filed his emergency bankruptcy petition. Thereafter, IDA's counterclaim, which still remained viable, was transferred by Judge Davidson to this court for adjudication.

To finalize the chronicle of Blount's involvement with the scooters, the court notes that in December, 1989, Blount sold three of the corporations that he owned to Wespac Medical Products, Inc., a Texas entity. The companies were Mississippi Durable Medical Equipment, which manufactured lift chairs, B–Mec Inc., which also manufactured lift chairs, and Medical Concepts, which had been organized to produce the scooters. Wespac returned Mississippi Durable Medical Equipment and B–Mec to Blount in March, 1990, but retained ownership of Medical Concepts. Wespac changed its corporate name to Medical Resources Company of America and entered into a transaction for the marketing of the scooters with Odyssey Mobility Systems, Inc. The scooters have now been sold in theme

parks across the United States under the brand name Med Con I. The total extent to which these scooters were modified from the IDA design is unknown to the court although some relatively minor modifications were mentioned during the trial testimony.

Mississippi Durable Medical Equipment and B–Mec ceased business operations, primarily because Medicare, beginning in December, 1989, terminated its program which paid for lift chairs for eligible customers. Blount testified that this Medicare policy change also caused Saul Fesman to abandon his lift chair business which he operated under the name of Queen City Home Health Care, Inc. This occurred at a time when Fesman allegedly owed Blount substantial sums of money.

Blount indicated that the Wespac transaction was financially disastrous for him because Wespac failed to honor several material contractual obligations.

There was a substantial amount of testimony regarding Blount's efforts to shield assets from the reach of his creditors. The evidence also indicated that Blount and his wife, Julia, transferred practically all of the assets held in their names to two Louisiana corporations on the eve of filing bankruptcy. Although this testimony is significant in revealing Blount's motivation and adversely affecting his credibility, it has little impact on the outcome of the adversary proceedings currently before the court.

## III.

### STATEMENT OF THE ISSUES

After hearing the testimony and reviewing the documentary evidence, the court concludes that there are essentially two issues in these adversary proceedings. They are set forth as follows:

A. Whether the debt in the sum of $94,-270.75, admittedly owed to IDA by either Mississippi Medical, Inc., Mississippi Durable Medical Equipment, Inc., or Medical Concepts, Inc., and allegedly guaranteed by Blount, causing IDA to release the scooter patent rights, is a nondischargeable debt

pursuant to 11 U.S.C. § 523(a)(2)(A). This section reads as follows:

> (a) A discharge under section 727, 1141, [,] 1228[a] 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

B. Whether IDA is entitled to damages because of the allegedly frivolous lawsuit filed and prosecuted by Blount and Mississippi Durable Medical Equipment against IDA in the Circuit Court of Calhoun County, Mississippi, the United States District Court for the Northern District of Mississippi, and this court, as well as, whether these damages are nondischargeable in this bankruptcy case pursuant to 11 U.S.C. § 523(a)(6), which reads as follows:

> (a) A discharge under section 727, 1141, [,] 1228[a] 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

## IV.

### CONCLUSIONS OF LAW

#### A. DISCHARGEABILITY OF THE DEBT OWED TO IDA

In order to resolve the question of whether Blount, in fact, defrauded IDA as contemplated by 11 U.S.C. § 523(a)(2)(A), several factors must be restated:

1. From the court's perception, the only possible evidence of fraud against Blount centered on his authorizing Henry Lackey to fax the letter to Mike Yardley at IDA on May 10, 1989. As a result of this letter, IDA voluntarily transferred certain patent documents to Lackey for Blount's benefit. The value of these documents was never introduced into evidence, so the court cannot even begin to evaluate what IDA

gave up as consideration for the letter. If the letter could be construed as a fraudulent representation, the value of the patent documents to IDA would be the appropriate measure of damages, not the amount of the preexisting debt already owed to IDA.

In this context, the court also recalls testimony to the effect that IDA had questionable justification legally to refuse to release the patent documents to Lackey and/or Blount.

■ 2. IDA contends that the faxed letter from Lackey was a personal guarantee offered by Blount. The letter simply said that ".... you (IDA) would be paid in full on or before June 30, 1989." There is no language in the letter to indicate that Blount, individually, was promising to make the payment. The letter could easily be interpreted to mean that the payment would be forthcoming from "Mississippi Medical," the entity that had been billed for all of the work performed by IDA. In the opinion of the court, the letter is legally insufficient to be considered as a personal guarantee of a corporate debt.

■ 3. The letter is clearly a promise to perform an act in the future. A promise of this nature cannot amount to fraud unless there is a present undisclosed intent not to perform at the time that the promise is made. *See, In re Posey*, 57 B.R. 858 (Bankr.N.D.Miss.1985). There was no proof of any description offered that either Blount or the "Mississippi Medical" entities had any present undisclosed intent not to perform when Lackey faxed the letter to IDA. As such, this letter amounts to nothing more than a promise to pay a past due debt approximately six weeks in the future; absent additional evidence, it cannot be construed by this court as an act of fraud.

■ 4. 11 U.S.C. § 523(a)(2)(A) states, inter alia, that an individual debtor is not discharged from any debt for services to the extent obtained by false pretenses, a false representation, or actual fraud. As to the $94,270.75, clearly owed by "Mississippi Medical" to IDA, the invoices reveal that this entire sum was due to IDA in full long before Lackey sent the faxed letter on

May 10, 1989. As such, neither the $94,-270.75 debt nor the services which underpin the debt were obtained by false pretenses, false representation, or actual fraud. The debt had been incurred and the services obtained before the letter was ever submitted.

For the above and foregoing reasons, the court must conclude that the debt owed to IDA in the sum of $94,270.75, is a dischargeable debt in Blount's bankruptcy case.

## B. WILLFUL AND MALICIOUS PROSECUTION OF THE LAWSUIT AGAINST IDA

■ The next issue concerns whether IDA is entitled to damages because of the allegedly frivolous lawsuit filed and prosecuted by Blount and Mississippi Durable Medical Equipment against IDA in the Circuit Court of Calhoun County, Mississippi, the United States District Court for the Northern District of Mississippi, and this court, as well as, whether such damages, if allowed, are nondischargeable debts in Blount's bankruptcy case pursuant to 11 U.S.C. § 523(a)(6).

In order to find that the damages claimed by IDA are nondischargeable under the aforementioned Code section, the court must conclude that the actions by Blount were both willful *and* malicious. The Fifth Circuit Court of Appeals has adopted the definition of "willful and malicious" as set forth in *Collier on Bankruptcy*. See *Vickers v. Home Indemnity Company, Inc.*, 546 F.2d 1149 (5th Cir. 1977); *In re Dardar*, 620 F.2d 39 (5th Cir.1980); *Seven Elves, Inc. v. Eskenazi*, 704 F.2d 241 (5th Cir.1983); *In re Quezada*, 718 F.2d 121 (5th Cir.1983). *See also, In re Cecchini*, 780 F.2d 1440 (9th Cir. 1986). *Collier* provides:

In order to fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-

will. The word "willful" means "deliberate or intentional," a deliberate and intentional act which necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

3 *Collier on Bankruptcy*, 523.16 at 523–129 (15th ed. 1992).

*See also, In re Lefeve*, 131 B.R. 588 (Bankr.S.D.Miss.1991)

There is no question that the filing of the lawsuit by Blount was intentional. However, whether it was malicious, i.e., wrongful and without just cause or excuse, is another question.

The court heard a great amount of testimony concerning problems that were encountered with the scooters. Excerpts from the testimony of Clyde W. Henderson and Bedford Forest "Buzz" Peoples were set forth earlier in this opinion. Added to this is the testimony of Attorney Hale Freeland, who represented Blount and Mississippi Durable Medical Equipment in the lawsuit. Freeland corroborated that complaints about the scooter had indeed been voiced by Henderson, Peoples, and Ronald Mostich. He outlined the following issues which he considered to be viable elements of the complaint against IDA, to-wit:

A. IDA was not qualified to design such a scooter.

B. IDA had negligently designed the scooter.

C. IDA had contractually agreed to prepare final production drawings which went beyond the delivery of the initial scooter prototype.

Candidly, Freeland stated that the lawsuit was not a "clear cut winner," but, in his mind, it had a sound basis in fact and in law.

Although the filing of the lawsuit only two days after receipt of the demand letter from IDA was obviously a "forum shopping" technique, there is nothing inherently wrong with this if the underlying cause of action is legitimate.

Problems were obviously encountered with the scooters when production was commenced. IDA had designed the scooter and then attempted to correct a number of problems as they arose. This evidences an awareness by all of the parties that the project was not proceeding smoothly. This also should have put the parties on notice that if mutually satisfactory arrangements could not be negotiated as to the extent of IDA's services and responsibilities, as well as, the payment for same, that litigation was a distinct possibility.

After carefully reviewing all of the testimony, the court concurs with the comment of Attorney Freeland. The lawsuit may not have been a "clear cut winner," but it was not filed wrongfully nor without just cause or excuse. The testimony certainly does not indicate that the lawsuit was frivolous.

Therefore, for the reasons cited above, the court is of the opinion that the complaint filed by IDA seeking a determination that the alleged damages, resulting from the lawsuit filed by Blount, are nondischargeable debts is not well taken. Because of this ruling, IDA's counterclaim for damages is rendered moot. A separate order will be entered consistent with this opinion.